LINCOLN BENEFIT LIFE COMPANY, a Nebraska Domestic Insurance Corporation, Plaintiff,

v.

Robert R. EDWARDS, Defendant.

No. 4:95CV3098.

United States District Court, D. Nebraska.

March 24, 1999.

---

Gary J. Nedved, Keating, O'Gara Law Firm, Lincoln, NE, Terry R. Wittler, Cline, Williams Law Firm, Lincoln, NE, for plaintiff.

Rexford H. Caruthers, Holloran Law Firm, St. Louis, MO, R. Murray Ogborn, Ogborn, Summerlin Law Firm, Lincoln, NE, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KOPF, District Judge.

This case involves a series of agreements under which an insurance company and one of its former marketing directors both claim they are owed money. Following a bench trial on the merits of this case, I now issue my findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).[1]

### I. BACKGROUND

This action originated in the District Court of Lancaster County, Nebraska, as an action for declaratory judgment in which plaintiff Lincoln Benefit Life Company ("LBL") alleged that defendant Robert R. Edwards ("Edwards") owed LBL $452,558.29 pursuant to various agreements between LBL and Edwards. Under these agreements, Edwards, a marketing director for LBL, received overwriting commissions on insurance premiums collected by LBL on insurance policies that were sold by agents who were assigned to Edwards and for whom Edwards was to provide training, supervision, and administrative support. In exchange for such overwriting commissions, Edwards became responsible to LBL for indebtedness created by the agents assigned to him. LBL

filed the above-described declaratory judgment action seeking payment from Edwards under agreements which reflected that indebtedness. Pursuant to 28 U.S.C. §§ 1332(a), 1441, and 1446, Edwards filed a notice of removal of this action from state court to federal court (filing 1).

The agreements between LBL and Edwards that are at the core of this dispute are the following:

- General Agent Agreement effective February 1, 1982
- Marketing Director Agreement effective February 1, 1982, and oral agreement reached on the same date regarding assignment of agents in the Dallas–Fort Worth area
- Master General Agent Agreement effective March 29, 1984
- Continuing Compensation Addendum to Marketing Director Agreement dated July 10, 1985
- Agreement Acknowledging Edwards' Indebtedness to LBL dated March 7, 1986
- Revision of Indebtedness Amount dated May 1, 1987

Edwards asserts five counterclaims against LBL based on these agreements:

- *Count I—Preferential Commissions:* LBL breached the Marketing Director Agreement dated February 1, 1982, by granting two other marketing directors secret and preferential commission increases without passing the same increases on to Edwards, as provided in the agreement.
- *Count II—Assignment of Agents:* LBL breached its oral agreement of February 1, 1982, to assign to Edwards all agents under contract to LBL and located in the Dallas–Fort Worth market area.
- *Count III—Indebtedness Agreement:* The March 7, 1986, agreement acknowledging Edwards' indebtedness

---

1. Any finding of fact more properly characterized as a conclusion of law, and any conclusion of law more properly deemed a finding of fact, should be so construed.

to LBL created by one of Edwards' subagents should be rescinded.

- *Count IV—Continuing Compensation Addendum (Breach of Contract):* LBL breached the July 10, 1985, Continuing Compensation Addendum to the Marketing Director Agreement which provided a retirement package that LBL was obligated to pay when LBL terminated Edwards.[2]
- *Count V—Continuing Compensation Addendum (Tort):* LBL is liable in tort to Edwards for breach of the implied covenant of good faith and fair dealing arising from the Continuing Compensation Addendum.

LBL has asserted the statute of limitations as a defense to Counts I and II of Edwards' counterclaims. I previously conducted a bench trial on that issue and decided that such counterclaims were not barred by the statutes of limitation, Neb. Rev.Stat. §§ 25–205 & 25–206 (Michie 1995). *Lincoln Benefit Life v. Edwards,* 966 F.Supp. 911 (D.Neb.1997).[3] I entered judgment accordingly pursuant to Fed. R.Civ.P. 54(b) (filing 80). The Eighth Circuit Court of Appeals affirmed this court's Fed.R.Civ.P. 54(b) judgment on the statute-of-limitations issue (filing 193), but la-

ter vacated its decision and dismissed LBL's appeal, deciding that this court's Rule 54(b) judgment was not an appealable final judgment or order (filing 195).

LBL then moved (filing 196) to vacate this court's Findings of Fact and Conclusions of Law and Rule 54(b) judgment addressing the statute-of-limitations issue. I granted the motion in part and vacated the Rule 54(b) judgment, but I denied the motion as to the court's Findings of Fact and Conclusions of Law. Therefore, the court's previous Findings of Fact and Conclusions of Law on the statute-of-limitations issue remain intact and serve as the basis for a portion of the Findings of Fact below.

## II. FINDINGS OF FACT

1. Plaintiff Lincoln Benefit Life Company ("LBL") is a Nebraska domestic insurance corporation with its home office in Lincoln, Nebraska. Defendant Robert R. Edwards ("Edwards") is a resident of Dallas, Texas. (Filing 63, at 3.)

2. Prior to 1982, LBL employed salaried regional vice presidents who were responsible for recruiting general agents through whom LBL marketed and sold its

---

**2.** On August 6, 1997, Edwards filed a motion for preliminary injunction (filing 90) seeking to compel payment by LBL of retirement benefits due under the Continuing Compensation Addendum to the Marketing Director Agreement so that Edwards could avoid foreclosure on his home. Upon agreement of counsel, I ordered on August 11, 1997, that Edwards' motion for preliminary injunction be consolidated with the trial on the merits of Edwards' fourth and fifth counterclaims related to the Continuing Compensation Addendum (filing 93). On March 26, 1998, I denied Edwards' motion for preliminary injunction for statistical purposes without prejudice to its consideration at the time of trial (filing 161). Edwards' motion for preliminary injunction was not explicitly included in the Joint Order on Pretrial Conference (filing 171) as an issue to be determined at trial; however, the basis for Edwards' motion—interpretation of the Continuing Compensation Addendum—has been incorporated into Edwards' fourth and fifth counterclaims related to the Continuing Compensation Addendum.

**3.** Specifically, I stated:

Therefore, I conclude that because there was an agency relationship between Edwards and LBL, the statutes of limitation cited by LBL, Neb.Rev.Stat. §§ 25–205 & 25–206 (Michie 1995), did not begin to run on Edwards' counterclaim until February 1995, the month in which Edwards' demand for an accounting was refused and in which LBL terminated the contractual relationship between it and Edwards.

Further, even if the "discovery rule" applies, as LBL argues, Edwards did not discover, nor could he have discovered in the exercise of reasonable diligence, his cause of action regarding preferential commission rates during his agency relationship with LBL, which did not terminate until February 1995.

*Lincoln Benefit Life v. Edwards,* 966 F.Supp. 911, 921–22 (D.Neb.1997).

life insurance policies and annuity contracts. In 1982, LBL adopted a new marketing program and decided to replace these salaried regional vice presidents with independent, non-salaried, marketing directors who worked off commission and who had the resources to market and sell LBL's products through the appointment of general agents for LBL. (Stat. Lims. Tr. 195:20–197:8.[4]) In an effort to "sell" this opportunity, LBL invited eight prospective marketing directors to Lincoln in 1982. (Stat.Lims. Tr. 197:25–198:23.) Edwards was one of these original eight marketing directors.

### The 1982 and 1984 Agreements

3. Effective February 1, 1982, LBL and Edwards entered into a Marketing Director Agreement pursuant to which Edwards agreed to market insurance products and to recruit, train, supervise, motivate, retain, and provide administrative support for agents assigned to him in exchange for overwriting commissions and bonuses. (Filing 63, at 3; Ex. 54–101, at 2.) This agreement gave Edwards the authority to develop and supervise the company's business in conformity with the rules and regulations of the company and assigned Edwards the responsibility to recruit and recommend persons for appointment by the company as agents and train and supervise such agents in accordance with the standards of the company. (Ex. 54–101, at 2.) Pursuant to the language of the Marketing Director Agreement, Edwards was an independent contractor, and not an employee or servant. (Ex. 54–101, at 2.) The agreement bound Edwards to exclusively represent the interest of the company and to not enter into any insurance sales agreements with other insurers or individuals, nor engage in any competing activities on behalf of other insurers or individuals unless authorized to do so in writing by the company. (Ex. 54–101, at 2.)

4. The Marketing Director Agreement, under the printed heading entitled "Compensation," contained the following language:

The rate of overwriting commission payable as compensation to the marketing director may be amended at any time by written notice to the marketing director. Any amendment to such rate shall become effective on the date specified in the notice. An amendment, when made, shall apply only to insurance policies or annuity contracts accepted by the company on or after the effective date thereof. *No amendment shall be made unless a similar amendment is made to all other marketing directors' Agreements between the company and other marketing directors.*

The compensation to be paid to the marketing director under this Agreement constitutes the total amounts payable to the marketing director, and shall be solely for services as an independent contractor acting on behalf of the company in the development and maintenance of a quality system for the marketing and sale of insurance policies or annuity contracts through General Agents.

The agent's statements rendered by the company concerning commissions paid and/or payable, advances and indebtedness shall be conclusive unless within thirty (30) days following receipt of the statement the marketing director notifies the company of a dispute regarding any transactions reported since the last preceding report.

(Filing 63, at 3; Ex. 54–101, at 2–3 (capitalization altered & emphasis added).)

---

4. Citations to "Stat. Lims. Tr." and "Stat. Lims. Ex." refer to the transcript and exhibits from the bench trial held January 14–16, 1997, on the issue of LBL's statute-of-limitations defense to Edwards' counterclaim for actual damages for breach of contract. The court granted Plaintiff's motion for a bifurcated trial on the statute-of-limitations issue in Filing 47. Citations to "Tr." and "Ex." refer to the transcript of, and exhibits received in, the trial on the merits of this action held April 7–17, 1998.

5. The section of the agreement entitled "Indebtedness" provided as follows:

The marketing director shall be responsible to the company for the acts and collections of his General Agents and for the indebtedness of his General Agents to the company. The company shall have a retaining first lien against any compensation payable hereunder for any indebtedness of the marketing director or his General Agents to the company, and the company may charge and set off any such amounts due from the compensation payable hereunder. Prior to charging the indebtedness of a General Agent to the marketing director the company shall make reasonable efforts to collect the indebtedness from the General Agent including the application of deferred first-year commission. The indebtedness of the marketing director or his General Agents may be declared due and payable whether or not any renewal commissions are payable.

(Ex. 54–101, at 3 (capitalization altered).) The Marketing Director Agreement did not provide for accrual of interest on the indebtedness of marketing directors. (Tr. 930:16–23, Test. of Theodore L. Kessner.)

6. As a part of this Marketing Director Agreement, Edwards and LBL entered into a "Submitted Annualized Commission/Loan Agreement" under which Edwards, as a marketing director, was entitled to advances or loans from LBL equal to 100 percent of the annualized first-year commission on life business submitted by Edwards' general agents. In order for insurance applications to qualify as a basis for loans to Edwards, the agreement stated that "the following requirements must be met:"

(1) Applications must be fully completed on all cases.

(2) Where a medical examination is required, no advance will be made until the examination report has been received and approved by our Underwriting Department.

(3) Initial premium must accompany the application in all cases. No advance will be made on COD business until the policy has been delivered and premium paid. On Monthly Automatic cases, a check for the initial monthly premium and a specimen check or a voided deposit slip must accompany the application.

(4) No personal business will be considered under this Submitted Annualized Commission/Loan Agreement.

(5) The company reserves the right to determine eligibility of all applications on an individual basis.

(Ex. 1, at 7 (capitalization altered).) Whether Edwards was acting as an agent, general agent, or marketing director on LBL's behalf, LBL never waived any of these requirements on business submitted by Edwards and Edwards never heard of LBL waiving these requirements on a "wholesale basis." (Ex. 1; Tr. 76:5–79:12.)

7. The Marketing Director Agreement provided that it shall be construed according to the laws of Nebraska, and that "[t]his Agreement shall supersede all previous agreements between the parties." (Ex. 54–101, at 4.)

8. In negotiating the 1982 Marketing Director Agreement with Edwards, LBL represented to Edwards that the Marketing Director Agreement would be the highest marketing appointment made within the company, which meant to Edwards that marketing directors would be paid at the top commission level possible. (Stat. Lims. Tr. 22:7–23.)

9. During the 1982 negotiations, LBL also orally represented that it would not "compete" to recruit future agents in the marketing directors' geographical areas— the Dallas–Fort Worth area in Edwards' situation—and that LBL would assign agents contracted by LBL located in Dallas–Fort Worth to Edwards. (Stat. Lims. Tr. 26:3–23; 29:18–23; Tr. 1019:15–1020:10, Test. of Anthony J. Czerwinski; Ex. 60, Depo. of Czerwinski, at 27:21–28:4.)

However, the 1982 Marketing Director Agreement provided that "the marketing director's territorial boundaries are not limited by the company unless otherwise stipulated in writing." (Ex. 54–101, at 3.)

10. Effective February 1, 1982, and contemporaneously with the Marketing Director Agreement, LBL and Edwards entered into a General Agent Agreement pursuant to which Edwards agreed to engage in the marketing of LBL's insurance products and to recruit, train, supervise, and provide administrative support for agents recruited by or assigned to Edwards in exchange for commissions as scheduled therein. This agreement allowed Edwards to write personal business and to receive commissions on that business under both the General Agent Agreement and the Marketing Director Agreement. (Filing 63 at 3; Ex. 54–102; Stat. Lims.Tr. 109:16–110:3; Ex. 4.) This agreement also contained the following "indebtedness" provision:

> The General Agent shall be responsible to the company for the acts and collections of his subagents and employees, and for the indebtedness of his subagents to the company. The company shall have a retaining first lien against any commissions payable hereunder for any indebtedness of the General Agent or his subagents to the company, and the company may charge and set off any such amounts due from commissions payable thereafter. *All such indebtedness of the General Agent shall bear interest at the rate of one percent (1%) per month and shall be absolutely repayable on demand from the company. Following demand for repayment or termination of this Agreement, whichever first occurs, all indebtedness shall thereafter bear interest at the maximum lawful rate until paid.* The indebtedness of the General Agent may be declared due and payable whether or not any commissions are payable.

(Ex. 4, at 2 (capitalization altered & emphasis added).)

11. Effective March 29, 1984, LBL and Edwards entered into a Master General Agent Agreement in which Edwards agreed to engage in the marketing of LBL's insurance products and to recruit, train, supervise, and provide administrative support for agents recruited by or assigned to Edwards in exchange for commissions as scheduled therein. The Master General Agent Agreement contained provisions that were substantially identical to the duties, compensation, indebtedness, independent contractor, and exclusivity provisions discussed above with regard to the Marketing Director Agreement. (Filing 63 at 3; Ex. 54–106; Ex. 7.) This agreement allowed Edwards to write personal business at a commission rate higher than that provided in his General Agent Agreement, and to earn commissions under the Marketing Director Agreement. (Stat.Lims.Tr.111:8–112:2.)

12. The above agreements were in full force and effect until LBL terminated its contracts with Edwards in 1995. (Stat. Lims.Tr. 110:4–23; 112:3–8.)

### Edwards' Duties for LBL

13. In order to carry out the terms of the above-described contracts in which Edwards agreed to recruit, train, and supervise agents in accordance with LBL standards, Edwards met with potential agents "on behalf of Lincoln Benefit Life"; "carefully select[ed] agents that he wanted to represent himself and the company and to sell the company's products," with LBL having the ultimate right to approve or disapprove Edwards' selections; worked with LBL's marketing department in Lincoln, Nebraska, in order to recruit and train agents; and followed LBL's "requirements and rules." (Stat.Lims.Tr. 88:14–22; 89:18–90:1; 99:13–20; 101:1–102:11; 252:19–253:20.) Acting as "the front line of management for the company," LBL marketing directors "supervised the field activities of the company." (Stat. Lims.Tr.201:5–8.)

14. When Edwards' subagents submitted insurance policy applications, such applications went directly to LBL, which processed and approved the policies and sent the policies directly to the subagents, who then delivered them to clients. (Stat. Lims.Tr. 113:2–114:25; 115:16–116:4; 174:20–175:17.) Edwards understood from "the very beginning" that LBL would handle accounting functions. (Stat. Lims.Tr.116:22–24.)

15. LBL's home office in Lincoln, Nebraska, had the sole discretion to approve agents recruited by Edwards based on a contract, personal statement by the agent, and a copy of the agent's state insurance license which Edwards forwarded to the home office, as well as a credit report run by LBL. Once the home office approved the recruited agent, Edwards had no "say-so over what potential purchasers that agent contacted." (Tr. 137:24–138:22; 377:16–19.) Edwards never saw the policy applications that were submitted by agents in his hierarchy to the home office or the resulting policies, nor was he ever involved in decisions regarding underwriting or policy issuance. (Tr. 138:23–139:20; 142:19–24.)

### New Marketing Strategy

16. In late 1984 or early 1985, LBL again changed marketing strategies and moved from a general agency system to a "life brokerage distribution system" whereby LBL would use nationally recognized marketing organizations that contracted with hundreds of agents instead of marketing directors. (Stat.Lims.Tr.225:6–226:23.) As part of this change in marketing strategy, LBL undertook a "significant overhaul of all the product lines that [they] were offering"; acquired new computer software and hardware to allow LBL to offer these new product lines; pursued a "national identity" through increased advertising; and expanded its business from 24 states to 49 states. (Tr. 693:18–696:16.)

17. While LBL was moving toward the brokerage strategy in 1984 and 1985, it still continued direct solicitation, as performed by the marketing directors, because LBL was "still experimenting" with the brokerage marketing idea. (Tr. 701:2–12.)

18. Under this brokerage distribution system, LBL sought to develop "managing brokerage agencies" that did not engage in personal production, but instead recruited and serviced large numbers of producing agents. (Tr. 707:25–708:12.) In order to develop the administrative services and support systems required of a brokerage agency, adequate financial support was required, as was an ability to recruit and manage a large amount of agents. (Tr. 708:6–23.) In order to build a brokerage "infrastructure," LBL expected its managing brokerage agencies to undertake nationwide recruiting campaigns requiring direct solicitation by telephone and mass mailings (which often required expanded office staff, personnel, and physical space), extensive nationwide travel, and development of expertise in some particular area, like advanced underwriting or estate planning. LBL did not expect its marketing directors to have an office or staff, travel outside of their immediate area, or develop any special expertise. (Tr. 711:8–714:9.)

19. LBL approached Tony D. Weber and Leroy Liberda about becoming Brokerage Marketing Directors and performing the above-described tasks because LBL believed Weber and Liberda "were the ones that had recruited the largest number [of agents] and had shown the ability to manage those people ... successfully." (Tr. 707:20–708:23.)

20. All Marketing Director Agreements were canceled and changed to "MBA" contracts—or "Master Brokerage Agency" contracts—by 1986, but Edwards' contract was not changed because repayment to LBL for Edwards' indebtedness situation, discussed below, was tied in part to his Marketing Director Agreement. While Edwards' Marketing Director Agreement was not changed, he, like the other marketing directors, became known

as an "MBA." (Stat.Lims.Tr.226:24–228:21; Tr. 849:13–15.)

### Preferential Commission Rates

21. Along with Edwards, Tony D. Weber and Leroy Liberda were part of the original group of marketing directors appointed by LBL in 1982. (Stat. Lims.Tr.31:18–20.)

22. In my previous opinion regarding the statute-of-limitations issue in this case, *Lincoln Benefit Life Co. v. Edwards*, 966 F.Supp. 911, 915 (D.Neb.1997), I made the following finding of fact: "Documents entitled 'Marketing Director Schedule of Life Commissions,' which were part of a January 1, 1984, commission schedule addendum to the Marketing Director Agreement, establish that Tony D. Weber and Leroy Liberda were receiving 12 percent more in commission on universal life products and one-half percent more on annuities than Edwards was receiving *at that time*. (Tr. 117:20–120:21; 121:8–126:21; Exs. 103 & 104.)" (Emphasis added.) In making that finding of fact, I assumed, based on testimony given by Edwards, that all of the commission schedules that were stapled together were part of the same addendum—that is, the addendum on the first page which was dated January 1, 1984. (*See* Stat.Lims. Tr. 118:6–119:7; 121:5–24 (testimony by Edwards that commission schedule addenda in Exs. 5, 6, 54–103 & 54–104 were presented in discovery and were attached to Weber's and Liberda's 1982 Marketing Director Agreements).) However, testimony presented during the liability trial in this matter by Fred Jonske, the former president and CEO of Lincoln Benefit Life, clarified that such addenda were issued as new products were issued and were not all issued at once. (Tr. 739:16–740:6 (testimony by Jonske that updated commission schedules "would be attached or sent to marketing positions" as different products were issued).) Therefore, I cannot now conclude that the undated document entitled "Marketing Director Schedule of Life Commissions" in Exhibits 5 and 6 became effective on January 1, 1984. Rather, the evidence establishes that Weber and Liberda did not begin receiving commission rates greater than Edwards until 1985, the year Weber and Liberda entered into "Brokerage Marketing Director" contracts with LBL, described in more detail below.[5] (*See also* Stat.Lims. Tr. 128:1–17 (attorneys for both parties stipulate increased compensation for Weber and Liberda began in 1985); Stat.Lims.Tr. 229:24–230:14 (testimony by Wraith that increased commission for Weber and Liberda occurred in April or May of 1985 to coincide with new brokerage distribution marketing strategy); Tr. 741:5–743:13 (testimony by Jonske that although he has no independent recollection about when increased rates were paid to Weber and Liberda, he understood they were to have started when Weber and Liberda became brokerage marketing directors and the commission schedule entitled "Marketing Director Schedule of Life Commissions" erroneously included the words "Marketing Director").)

23. Pursuant to LBL's new brokerage marketing strategy, LBL entered into "Brokerage Marketing Director" contracts with Weber and Liberda on April 1, 1985, in which Weber and Liberda were entitled to 12 percent more than Edwards in commission on various universal, ordinary, and whole life products; 5 percent more in commission on certain term policies; and one-half percent more on one annuity poli-

---

5. Whether Weber and Liberda received increased commissions in 1984, as opposed to 1985, or vice versa, was not a fact that affected my prior decision that the relevant statutes of limitation did not begin to run on two of Edwards' counterclaims until February 1995, the month in which Edwards' demand for an accounting was refused and in which LBL terminated the contractual relationship between it and Edwards. I also note that my prior determination on the statute-of-limitations issue did not include a decision about whether a breach of the 1982 Marketing Director Agreement actually occurred, but whether Edwards' cause of action was barred by the applicable statutes of limitation.

cy than Edwards. (Stat.Lims.Tr. 31:8–32:18; 33:18–22; 36:9–12; Exs. 2 & 3.) The agreement required that the appointed brokerage marketing director "possess[ ] the required financial and physical resources to promote the marketing and sale of insurance policies and annuity contracts to be issued by the company"; recruit and recommend persons for appointment as brokers for LBL; and assist in developing a system for marketing and sale of insurance policies and annuities through brokers. The agreement further specified that it "relates solely to brokerage marketing activity." (Exs. 2 & 3, at 1, 3, 11 (capitalization altered).)

24. Unlike the 1982 Marketing Director Agreement between Edwards and LBL, the Brokerage Marketing Director contracts between LBL and Weber and Liberda did not include a provision for bonuses or a "Submitted Annualized Commission/Loan Agreement" entitling Weber and Liberda to loans from LBL on life business submitted by agents in their hierarchies. According to Fred Jonske, President and CEO of LBL from 1982 to 1996, development of a brokerage marketing agency was not financially possible without increased commission rates, but such increased commission rates meant that the Brokerage Marketing Director contracts could not provide for bonuses and loans, as the Marketing Director contract did. (Tr. 682:22–25; 683:23–684:25; 709:11–710:15; 721:21–722:15.) As explained by Jonske:

> [T]he fundamental importance of the advancing system was that the marketing directors were basically expected to determine if the people were creditworthy. They were the ones that were recruiting the people.... [U]nder a brokerage sys-

tem, it's a much more arm's length transaction.... The managing brokerage agency ... could not accept that responsibility....

(Tr. 710:17–711:1.)

25. While not intended to be in writing, the Brokerage Marketing Director contracts with Weber and Liberda (Exs. 2 & 3) are an accurate written statement of confidential oral agreements between Weber, Liberda, and Bernard Eugene Wraith [6], who was at that time vice-president of agencies with oversight of the marketing directors. (Stat.Lims.Tr.234:13–236:8.) Wraith personally gave Weber and Liberda preferential commission rates as part of this oral arrangement in April or May 1985. Wraith told Weber and Liberda that the arrangement was to be kept strictly confidential, as are all employee salaries, and that "if someone found out about it, [Wraith] had every intention to discontinue it." (Stat.Lims.Tr. 230:8–232:8; 233:11–234:2; Tr. 716:2–14, Test. of Fred Jonske (it is "standard operating procedure[ ]" to keep salary information confidential).) [7]

26. Edwards heard rumors at a September 1989 LBL marketing conference that Weber and Liberda were receiving a higher commission rate than Edwards was receiving. (Stat.Lims.Tr. 38:1–39:3; 39:24–41:21.) Edwards then discussed his concerns about disparate commission rates with Wraith. After engaging in discussions with Edwards regarding the commission issue, and wanting to "buy some time" and to have a discussion document to show other officers of the company, Wraith directed Edwards to reduce his concerns to writing. (Stat.Lims.Tr.240:7–18.) Wraith wanted Edwards to communicate with him

---

6. Wraith is now president and chief operating officer of LBL. (Tr. 193:17–19.)

7. The Brokerage Marketing Director agreements with Weber and Liberda were signed by both parties to the contract in 1986, but they were backdated to become effective on April 1, 1985. The parties do not suggest that this is of legal consequence. *See, e.g., Restatement (Second) of Contracts* § 136 & cmt. b

(1981) (in the context of the statute of frauds, "[a] memorandum sufficient to satisfy the Statute may be made or signed at any time before or after the formation of the contract."; "There is no requirement that the memorandum be made contemporaneously with the contract. It may be made even after breach or repudiation.").

in writing about this issue because Wraith "needed to talk to some other officers within the company about how much information we wanted to allow Mr. Edwards to have." (Stat.Lims.Tr.242:6–9.)

27. On May 30, 1990, Edwards sent by facsimile to Wraith a collection of documents in which Edwards stated, "I now know Le Roy [Liberda] was receiving a 105% contract approximately one year before my [March 7, 1986,] contract was negotiated." (Stat.Lims.Ex. 4 at 9 ¶ 5; Stat.Lims.Tr. 62:15–20.) A "105% contract" meant that Liberda was receiving 10 percent above the standard amount of compensation for marketing directors. (Stat.Lims.Tr.69:10–20.)

28. According to Wraith, LBL's reason for giving preferential commission rates to Weber and Liberda was that they were the only two former marketing directors LBL felt would succeed in LBL's new life brokerage marketing system, and the preferential rates were intended to help Weber and Liberda make the transition into this new marketing system. (Stat. Lims.Tr.228:22–230:7.)

29. In 1991, Edwards and all master brokerage agents received a chart showing commission rates for various types of agents on various LBL products. The chart sent to Edwards showed "MBA" at a 95–percent rate—the highest rate—on certain universal life products. (Stat. Lims.Tr. 344:17–345:18; Ex. 54–117.) However, at that same time, Wraith prepared and kept "for [his] use only" another commission chart showing "BMD" as earning the highest commission on the same product, 105 percent, and "CA" as earning 100 percent. (Stat.Lims.Tr. 345:19–346:13; 346:23–347:9; Ex. 54–118.) Therefore, LBL's statement in a December 11, 1990, letter to Edwards that the MBA—master brokerage agent, replacing the marketing director designation—was the "highest contracted marketing position," was false. (Ex. 54–116; Stat.Lims.Tr. 346:14–18.) Wraith admits that LBL hired only two "BMDs" at that time—Weber and Liber-

da—and that he never intended the confidential commission chart to be sent or shown to Edwards. (Stat.Lims.Tr. 346:19–22; 348:9–17.)

30. From the date Edwards' 1982 Marketing Director Agreement was executed until LBL terminated Edwards in 1995, LBL did not provide to Edwards any written information with respect to LBL's preferential commission arrangement with Weber and Liberda. (Stat.Lims.Tr. 106:7–12; 120:22–121:4.) While Wraith confirmed to Edwards within two weeks after Edwards' May 1990 facsimile to Wraith that Weber and Liberda were indeed receiving preferential commission rates, Wraith's confirmation was communicated in such a manner that Edwards was led to believe that the preferential commission rates were a result of an indebtedness situation similar to that involving Edwards, described below. (Stat.Lims.Tr. 39:15–19; 51:2–6; 68:3–8; 356:4–357:4.)

31. According to a former second vice-president of LBL who was with the company from 1975 to 1987 and who was in charge of commissions during a portion of that time, if an agent called LBL asking whether they were receiving the highest possible commission, the vice-president "would probably have tried to be evasive about the situation, as discreet as I could be, without letting him know that there was a possibility that he didn't have the highest contract.... [j]ust so we did not discuss other people's contracts with other agents." (Stat.Lims.Tr. 369:16–17; 371:1–3; 421:10–422:9.)

32. No matter how closely Edwards scrutinized his records involving LBL, he would not have been able to tell that LBL had given a higher commission rate to Weber and Liberda. (Stat.Lims.Tr. 281:19–22 (testimony of Wraith).)

### Assignment of Agents

33. As stated above, during the 1982 negotiations leading to Edwards' Marketing Director Agreement with LBL, LBL orally represented that it would not com-

pete with the marketing directors in recruiting agents and it would assign agents contracted by LBL located in Dallas–Fort Worth to Edwards. (Stat.Lims.Tr. 26:3–23; 29:18–23; Tr. 1019:15–1020:10, Test. of Anthony J. Czerwinski; Ex. 60, Depo. of Czerwinski, at 27:21–28:4.) Wraith testified that he was not aware of such an agreement, and that LBL did assign agents in the Dallas–Fort Worth area to marketing directors other than Edwards. (Stat.Lims.Tr.243:19–244:1.)

34. In December 1985 Edwards first became aware that LBL was not assigning all of its agents in the Dallas–Fort Worth area to Edwards. (Stat.Lims.Tr.79:17–80:1.) LBL notified Edwards when new agents were assigned to him, but LBL did not notify him if newly recruited agents within Edwards' geographical area were not assigned to him. (Stat. Lims.Tr.116:25–117:8.)

35. From 1986 to 1991, LBL experimented with, and had a practice of, assigning agents to marketing directors and master brokerage agents, but concluded that assigning agents was no more productive than keeping such agents with the home office. Therefore, LBL discontinued their practice of assigning agents in 1991. (Tr. 770:24–773:5; Ex. 60, Depo. of Patricia Hertlein 31:7–33:15.)

### Indebtedness Agreement

36. Don Clark, d/b/a Prestige Investment Enterprises, was a general agent in Edwards' marketing director hierarchy. (Tr. 123:15–23.)

37. In January 1983, Gene Wraith advised Edwards that Don Clark and some of his agents and subagents were submitting false applications for insurance. (Tr. 123:24–124:21; 432:5–23.) These "false" applications were completed by actual individuals, but Clark had a practice of adjusting the amount of premium due, as it appeared on the application, by adding zeros to that amount. For example, a genuine application that reflected a $10.00 premium would be adjusted by Clark to

reflect a $100.00 premium. Clark would then group these falsified applications together under the name of a fictitious company. Based on such applications and on the Submitted Annualized Commission/Loan Agreements of agents in Clark's agency, LBL would advance Clark and his agents commissions based on the inflated amount of expected premium, but LBL was unable to collect the inflated premium amount after it attempted to bill the fictitious company. Edwards had no indication that Clark was submitting false applications until Wraith so advised him because such applications were submitted directly from Clark's office to LBL's home office without any review by Edwards. (Tr. 428:21–434:18.) LBL's home office reviewed such insurance applications and had total decision-making authority over what policies were issued and over administration of advances or loans to agents based on expected premiums. (Tr. 818:21–821:16.)

38. LBL admits that "[i]n many instances" the requirements contained in the Submitted Annualized Commission/Loan Agreements which allowed Clark and his agents to receive commission advances or loans were waived by LBL. In other words, LBL extended loans against expected premium to the agents that caused Edwards' indebtedness without requiring complete applications, medical examinations approved by LBL's underwriting department, and submission of the initial premium, as required by the Submitted Annualized Commission/Loan Agreements of those agents. (Tr. 228:19–23; 231:7–232:8; 436:25–437:16.) Edwards was not aware that LBL had waived such requirements for the benefit of Don Clark's agency until after this lawsuit was filed. (Tr. 125:9–14; 229:9–16; 380:10–16.)

39. On behalf of LBL, Gene Wraith sent a letter to Edwards on May 9, 1983, which stated in part:

This will confirm our discussions regarding the indebtedness to Lincoln Benefit Life incurred by the Prestige Invest-

ment Enterprises Agency. The latest figures available at this time estimate this indebtedness to be $293,824.20 with offsetting 1st year deferred commissions estimated at $186,741.80.

As per our Marketing Directors Agreement, you will be immediately charged with this indebtedness.

(Ex. 54–129.) Edwards construed this letter to mean that, under his Marketing Director Agreement, he was being charged with approximately $107,000 for the indebtedness created by Clark's agency. He did not know what portion, if any, of the stated indebtedness included interest. (Tr. 127:11–25; 130:3–20.)

40. On February 27, 1985, Gene Wraith wrote a letter to Edwards which·stated, "We need to discuss your account conditions and the possible [e]ffects of transferring the Prestige debits to your account in the near future." (Ex. 1087.)

41. Although Edwards was reminded of the indebtedness situation in the two letters from Wraith described above, from the time Edwards received Wraith's letter in May 1983 until March 7, 1986, when Edwards met with various LBL officials in Lincoln regarding the indebtedness issue, Edwards was not advised of any change in the amount of indebtedness owed to LBL. (Tr. 128:7–24, 212:21–214:4.)

42. Gene Wraith told Edwards that the indebtedness being charged to Edwards fell under his Marketing Director Agreement, and not under his General Agent Agreement. (Tr.232:4–12.) Edwards never had any agent indebtedness charged to his 1982 General Agent Agreement. (Tr. 125:15–17.)

43. Edwards met with Wraith, CEO and vice president of LBL; Fred Jonske, president of LBL; Ted Kessner, LBL attorney; and Doug Gaer, the LBL financial officer, in March 1986 to discuss LBL's assignment of agents to Edwards. On March 7, 1986, Edwards signed an agreement (the "Indebtedness Agreement") to pay LBL $433,100.72, plus interest, resulting from indebtedness created in 1982 and 1983 by Don Clark, d/b/a Prestige Investment Enterprises, and by several other former subagents who were identified in a seven-page handwritten schedule that was attached to the agreement. (Ex. 44.) This handwritten schedule separately listed the debts created by several agents·for which Edwards was to be held accountable under the 1996 Indebtedness Agreement. Each sum written on the schedule represented the amount of debt that had accrued pursuant to each agent's general agency contract, but the amounts of principal and interest that constituted each debt were not separately identified. (Tr. 1035:8–1036:5; Ex. 54–105.)

44. The Indebtedness Agreement contained the following provisions, some of which are quoted and some of which are summarized below:

"As of February 15, 1986, the indebtedness of the terminated subagents was $433,100.72."

"Edwards acknowledges and agrees that he is obligated to LBL under the terms of his Marketing Director Agreement to pay to LBL the $433,100.72 indebtedness plus interest accruing thereon...."

Edwards agreed to pay LBL in regular monthly installments, with the full amount to be paid by March 10, 1989.

"The indebtedness of the individual terminated subagents shall continue to accrue interest as stated in their agency agreements with LBL. LBL shall regularly inform Edwards of the amounts owed by each such agent and the total of the indebtedness."

LBL was entitled to "declare the whole amount of the indebtedness due and payable" if Edwards voluntarily terminated his Marketing Director Agreement with LBL; if LBL terminated Edwards' Marketing Director Agreement "for cause (as provided in the Marketing Director Agreement)"; or if Edwards was declared insolvent or bankrupt.

"To assist Edwards to fulfill his obligation to LBL for the indebtedness," the Indebtedness Agreement also amended Edwards' Marketing Director Agreement by increasing his life commissions by five percent (to 100 percent) on existing brokers who were reassigned to Edwards, and by 10 percent (to 105 percent) on new brokers, and by increasing his annuity commissions by one-half percent (to seven and one-half percent) on reassigned existing brokers, and by one percent (to eight percent) on new brokers. These increased commissions were classified as income to Edwards, but were retained by LBL to pay down the amount of indebtedness. In exchange for Edwards' "good faith effort to pay the indebtedness," LBL also agreed to assist Edwards in recruitment of additional brokers in the Dallas–Fort Worth area and to assign such brokers to Edwards. (Stat.Lims.Tr. 143:1–147:21; Tr. 151:21–152:3.)

(Ex. 44.)

45. At a meeting leading up to the above-described Indebtedness Agreement, Gene Wraith told Edwards that the additional compensation and reassigned agents would allow the indebtedness to be "paid off without costing [Edwards] anything," and Edwards relied upon that assurance. (Tr. 221:11–15; 223:9–25; 234:7–17.) Officers of LBL expected the company's agents and employees to trust the company, and LBL officers expected LBL agents and employees to rely on promises LBL officials made to them. (Tr. 859:4–860:19.)

46. In response to Edwards' inquiry about the differing amounts of indebtedness reflected in the Indebtedness Agreement as compared to Wraith's 1983 letter to Edwards, Gene Wraith told Edwards that the amount of indebtedness had increased from approximately $293,824.20 (minus offsetting first-year deferred commissions estimated at $186,741.80) in 1983 to $433,100.72 in 1986 due to the accrual of interest, but he was not able to tell Edwards how much of that total was attributable to interest. (Tr. 225:6–20; 234:1–4.) Wraith told Edwards that Edwards would "probably be terminated" if he didn't sign the Indebtedness Agreement as it was presented to him. (Tr. 226:9–23.)

47. Edwards signed the 1986 Indebtedness Agreement because of the representations made to him by Wraith that the increased compensation and assignment of agents provided in the agreement would allow Edwards to pay off his indebtedness without costing him anything, and that Edwards would be terminated if he failed to sign the agreement. (Tr. 234:7–17.)

48. Fred Jonske testified that from the time Clark's agency was terminated in 1983 until the date the 1986 Indebtedness Agreement was signed, LBL was investigating Edwards' performance, analyzing whether deferred commissions would retire Edwards' indebtedness, and attempting to collect the debt from the agents in Clark's former agency. (Tr. 753:15–754:13.)

49. As a result of signing the Indebtedness Agreement, LBL assigned Edwards approximately 110 additional agents. (Tr. 240:4–12.) Although the 1986 Agreement provided that Edwards would receive an increased rate of commission until March of 1989, Edwards continued to receive the increased rate of commission until 1991 due to an "oversight." (Tr. 758:25–759:7.) In late December of 1990, Gene Wraith informed Edwards by telephone that LBL planned to stop paying Edwards the additional compensation provided for in the 1986 Indebtedness Agreement. LBL stopped paying this additional compensation to Edwards in February of 1991. Further, Edwards received a letter from Rod Foster, Associate Vice President of Marketing for LBL, on January 4, 1991, stating that LBL was immediately stopping its "practice of assigning newly recruited agents in Dallas, Texas, and surrounding area." (Tr. 249:8–24; 262:4–5; 413:2–3; Ex. 58.)

50. On May 1, 1987, Edwards and LBL entered into an addendum to the March 7, 1986, agreement that required Edwards to make timely monthly payments to LBL in the amount of $2,755.00 for 120 months, after which LBL would deem the total amount of indebtedness, with interest, to be paid in full. The agreement stated that "[t]he payments are based upon the amortization of $250,000 with interest at 6% per annum over the term stated." (Ex. 38, at 6.)

51. The amount of Edwards' indebtedness to LBL was not reflected anywhere besides the above-described documents. The amount of indebtedness was not recorded on Edwards' weekly commission statements, and could have been calculated only by consulting "the individual subagent accounts," that is, statements of the agents who reported to Edwards. (Stat. Lims.Tr.360:14–361:22.)

52. There is not now, nor was there ever, a document identifying what portion of Edwards' indebtedness was principal and what portion was interest, when the assessment of interest began, or the amounts to which interest was initially applied. (Ex. 60, Oct. 27, 1997, Dep. of Patricia Wittmaack at 40:4–8, 50:10–22; Req. for Produc. & Responses, Questions 14 & 15; Mar. 16, 1998, Dep. of Douglas Gaer at 6:18–7:13, 9:13–24.) Further, no one from LBL has ever verbally communicated to Edwards how much of the indebtedness identified in the 1986 Indebtedness Agreement was interest and how much was principal. (Tr. 234:1–6.)

53. The parties have stipulated that $255,713.77 in "payments [by Edwards] and credits" have been made toward the indebtedness owed to LBL from March 1, 1986, to March 31, 1998. (Exs. 1039 & 1040; Tr. 992:4–22.) Only "credits" to Edwards' indebtedness—as opposed by payments by Edwards—were made after September of 1991 because LBL agreed to "put the payments in limbo until [Edwards] . . . could accumulate enough agents to kind of offset that . . . compensa-tion that [LBL] took away from [him]." LBL did not inform Edwards how long the payment moratorium would last and did not state whether interest on the amount of indebtedness would continue to accrue. (Ex. 46; Tr. 251:24–253:3.)

54. LBL never informed Edwards how much money was generated from the increased commission rates he earned pursuant to the Indebtedness Agreement. (Tr. 427:16–20; 400:20–25.)

55. LBL claims that as of March 31, 1998, Edwards owes it $1,066,596.88 under the Indebtedness Agreement and its addendum. (Ex. 1040.) This amount was calculated by carrying the balance stated in the 1986 Indebtedness Agreement forward to March 31, 1998, at one percent interest per month, and subtracting monthly payments and credits made toward the amount due. (Exs. 1039 & 1040.)

### Continuing Compensation Addendum

56. On July 10, 1985, Edwards and LBL entered into a "Continuing Compensation Addendum" to the 1982 Marketing Director Agreement. (Ex. 47.) The Addendum provided that LBL would continue to pay Edwards commissions following the termination of his appointment as Marketing Director due to retirement, disability, or death in order to encourage Edwards "to continue his efforts to recruit, train and supervise quality general agencies to market the Company's plans of insurance" during his term of appointment. (Ex. 47, at 1.)

57. The Addendum stated that LBL would continue to pay commissions to Edwards after his termination under the following conditions:

a. The Company [LBL] will determine the average first year premium produced by each general agency assigned to the Marketing Director for the 3 years prior to the termination date.

b. If the sum of the averages is at least $500,000.00 and the 13 month persistency of such business is at least 75%,

the Company will pay to the Marketing Director an overwriting commission on first year premium produced by each such general agency after the termination date on an amount of first year premium not exceeding the determined average for each such general agency.

c. The commissions paid shall be an overwriting first year commission at a rate equal to the net first year commissions being paid to the Marketing Director for such general agencies and on the plans of insurance on the termination date. The Company's determinations of amounts of continuing compensation payable will be final.

d. No commissions shall be paid following termination if the termination was for cause as provided in the Marketing Director's Agreement. No further continuing compensation will be paid if following termination the Marketing Director, directly or indirectly, competes with the Company in the marketing of plans of insurance or is guilty of conduct [that] is injurious.

(Ex. 47 ¶ 1.)

58. The Addendum reserved LBL's right to terminate payment of commissions to Edwards if the amount payable was less than $600.00 annually. Further, the Addendum stated that commission payments would continue as long as "any of the plans of insurance continue in force on which commissions are paid." (Ex. 47 ¶ 2.)

59. Edwards has never received any money under the Continuing Compensation Addendum. (Tr. 280:2–8.)

### Request for Accounting and Termination

60. Edwards made a formal written request to LBL for an accounting on January 23, 1994. (Ex. 54–124.) LBL denied Edwards' request by letter dated February 14, 1995. (Ex. 54–126.)

61. By letter dated February 21, 1995, LBL terminated Edwards' Marketing Director, Master General Agent, and General Agent contracts "as of March 31, 1995" for Edwards' "failure to fulfill [his] duties and responsibilities under these contracts." (Ex. 54–127.) LBL also filed a "Petition for Declaratory Judgment" against Edwards in the Lancaster County District Court on February 21, 1995, and Edwards filed a notice of removal in this court on March 15, 1995. (Filing 1.)

62. After Edwards' termination from LBL, Edwards filed a Chapter 13 bankruptcy proceeding which was then dismissed on January 16, 1997, due to Edwards' failure to make payments pursuant to the schedule issued in that proceeding. Unable to make his mortgage payments, Edwards' mortgage company began foreclosure proceedings, but the trustee's sale of his home was stopped after a purchaser produced the funds necessary to cover Edwards' back payments and reinstate the mortgage in Edwards' name. Edwards has entered into an agreement with this benefactor which allows purchase of Edwards' home for $312,000 at any time. The agreement also allows Edwards to pay off the mortgage, plus an additional sum, and regain ownership of the property. Edwards is not financially able to do so at this time. Edwards' home was appraised in July of 1997 at $480,000. (Tr. 280:19–284:9; Exs. 48–51.)

63. LBL paid Edwards $71,546.91 in 1995 and $46,482.24 in 1996 due to insurance renewals, and he continued to receive such renewals as of the date of trial. (Ex. 1022; Tr. 417:14–23.)

## III. CONCLUSIONS OF LAW

I shall address each of Edwards' counterclaims individually and, in the course of analyzing Edwards' third counterclaim related to the March 7, 1986, agreement acknowledging Edwards' indebtedness to LBL, I shall address LBL's claim that Edwards owes it money under that agreement.

### A. Count I—Preferential Commissions

#### 1. The Written Agreements

■ Edwards first alleges that LBL breached Edwards' 1982 Marketing Director Agreement when LBL began paying Tony D. Weber and Leroy Liberda greater rates of commission than Edwards was receiving on universal life products and annuity contracts. (Filing 171, Joint Order on Pretrial Conf., at 8.) As described in detail above, LBL began paying Weber and Liberda increased commission rates when it entered into Brokerage Marketing Director ("BMD") contracts with them on April 1, 1985. Edwards argues that these BMD contracts awarded Weber and Liberda commission on various insurance products that was greater than what Edwards was receiving under his Marketing Director Agreement, contrary to the language in the Marketing Director Agreement that provided: "No amendment shall be made [to the rate of overwriting commission payable] unless a similar amendment is made to all other marketing directors' Agreements between the company and other marketing directors." (Ex. 1, at 2–3.)

Weber and Liberda began receiving increased commission rates on various insurance products not when they were marketing directors, but when they entered into Brokerage Marketing Director contracts with LBL in 1985. Although Weber's and Liberda's BMD contracts are similar in many respects to Edwards' Marketing Director Agreement, there are significant differences between the two contracts which are dictated by the nature of the two positions.

First, unlike the Marketing Director Agreement governing Edwards' relationship with LBL, the BMD contract did not provide for commission advances or loans. Due to the "Submitted Annualized Commission/Loan Agreement" that was part of Edwards' Marketing Director Agreement, Edwards was entitled to receive, in effect, interest-free loans from LBL based on

expected premium from life business submitted by the general agents in his hierarchy. The BMD contract did not provide the same benefit to Weber and Liberda. Second, there is no provision in the BMD contract for commission bonuses, as there was in Edwards' Marketing Director Agreement. Third, the BMD contract explicitly required Weber and Liberda to promote LBL's products through "brokerage marketing activity" (exs. 2 & 3, at 11), activity which was not required by Edwards' Marketing Director Agreement.

As Fred Jonske explained, the structure of the BMD contract was dictated by the requirements that brokerage marketing directors invest a considerable sum of money in building their brokerage infrastructure through widespread recruitment campaigns consisting of nationwide mailings, travel, and telephoning, as well as development of expertise in some particular area, like advanced underwriting or estate planning. Thus, individuals who entered into BMD contracts with LBL were given larger commissions to build this infrastructure in lieu of commission advances (i.e., loans) and bonuses, to which marketing directors were entitled.

Because Weber and Liberda began receiving increased commission rates on various insurance products not when they were marketing directors, but when they entered into Brokerage Marketing Director contracts to perform functions for LBL under terms that were substantially different than those applicable to marketing directors, I find that LBL did not breach the portion of Edwards' 1982 Marketing Director Agreement that required commission amendments to all marketing directors' agreements if an amendment was made to one marketing director's rate of commission.

#### 2. Oral Agreement

■ To the extent Edwards argues that he and LBL orally agreed that the position of marketing director would be the highest contracted position LBL ever created, I

reject the claim for two reasons. First, for the reasons exhaustively discussed below with regard to Count II, parol evidence of an oral agreement reached during negotiations culminating in the 1982 Marketing Director Agreement that the marketing director contract would always be the highest contracted position in the company is legally ineffective and superseded or invalidated by the 1982 Marketing Director Agreement itself. Second, nothing in 1982 Marketing Director Agreement states that LBL was or is barred from creating other marketing positions or contracts.

Therefore, I shall enter judgment in favor of plaintiff Lincoln Benefit Life and against defendant Robert R. Edwards on Count I of Edwards' counterclaims regarding preferential commission rates.

## B. Count II—Assignment of Agents

█ Edwards claims that LBL breached an oral agreement made on or before February 1, 1982, to not compete in recruiting future agents in Edwards' geographical territory, the Dallas–Fort Worth area, and to assign to Edwards all agents under contract to LBL and located in the Dallas–Fort Worth market area. Specifically, Edwards alleges that LBL made such an oral agreement during the 1982 negotiations that culminated in Edwards' February 1, 1982, Marketing Agreement, and that this oral agreement "became part of the consideration for this Marketing Director Agreement and became an enforceable agreement between LBL and Edwards." (Filing 171, Joint Order on Pretrial Conference, at 9–10.) LBL argues that the 1982 Marketing Director Agreement superseded or invalidated this oral agreement regarding assignment of agents such that the parol evidence rule renders ineffective any evidence of the oral agreement. (*Id.* at 10.)

█ "When parties reduce an agreement to a writing, which in view of its · completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression." *Anderzhon/Architects, Inc. v. 57 Oxbow II Partnership*, 250 Neb. 768, 774–75, 553 N.W.2d 157, 161 (1996). Edwards does not appear to claim that his 1982 Marketing Director Agreement was not a final expression of the negotiations between him and LBL that resulted in the agreement; rather, Edwards argues that the oral agreement reached during those negotiations regarding assignment and recruitment of agents was a separate enforceable agreement between Edwards and LBL. I shall address Edwards' argument in the context of LBL's parol evidence argument.

## 1. Oral Agreement Regarding Assignment of Agents as Separate Enforceable Agreement

█ "When the parties have executed a completely integrated written document purporting to express the terms of their agreement, the parol evidence rule renders ineffective any evidence of a prior or contemporaneous oral agreement which adds to, alters, varies, or contradicts the terms of the written document." *Rowe v. Allely*, 244 Neb. 484, 486, 507 N.W.2d 293, 296 (1993) (citations omitted). However, the parol evidence rule is inapplicable to an agreement that is separate, distinct, and supported by separate consideration from the agreement that was reduced to writing. *Id.* at 486–87, 507 N.W.2d at 296.

(1) An oral agreement is not superseded or invalidated by a subsequent or contemporaneous integration, nor a written agreement by a subsequent integration relating to the same subject-matter, if the agreement is not inconsistent with the integrated contract, and

(a) is made for separate consideration, or

(b) is such an agreement as might naturally be made as a separate agreement by parties situated as were the parties to the written contract.

*Id.* at 487, 507 N.W.2d at 296 (quoting *Restatement of Contracts* § 240 (1932)) (also citing *Restatement (Second) of Contracts* § 213(2), cmt. c., and § 216(2), cmt. c. (1981), and 3 Arthur L. Corbin, *Corbin on Contracts* §§ 584 and 594 (1960), for proposition that separate agreements are not affected by the parol evidence rule). To apply the above test, I must (1) determine if the 1982 Marketing Director Agreement is completely integrated [8]; (2) if so, determine whether the oral agreement regarding assignment of agents is inconsistent with the integrated 1982 Marketing Director Agreement; and (3) if not, examine whether the oral agreement was made for separate consideration or whether the oral agreement is one that might naturally be made a separate agreement by similarly situated parties. If the answer to either of the questions in prong (3) is affirmative, the oral agreement regarding assignment of agents is not superseded or invalidated by the 1982 Marketing Director Agreement.

### a. Complete Integration of 1982 Marketing Director Agreement

The Nebraska Supreme Court has identified three tests that may be applied to determine whether a writing is completely integrated:

(1) Is the writing complete on its face; that is, does it include the whole or only a part of the transaction? The omission of important provisions may indicate the contract was not complete.

(2) Does the evidence outside the writing vary or contradict the written terms?

(3) As evidenced by the parties' conduct and language and the surrounding circumstances, did the parties intend the writing to cover the whole transaction?

*Rowe,* 244 Neb. at 488, 507 N.W.2d at 296; *Cleasby v. Leo A. Daly Co.,* 221 Neb. 254, 260, 376 N.W.2d 312, 317 (1985); *Traudt v.*

8. *See Rowe v. Allely,* 244 Neb. 484, 487, 507 N.W.2d 293, 296 (1993) ("In this court's opin-

*Nebraska Pub. Power Dist.,* 197 Neb. 765, 770, 251 N.W.2d 148, 151 (1977).

First, the Marketing Director Agreement states, "The Marketing Director accepts the appointment on the terms and conditions set forth herein," indicating that the agreement contains a complete statement of the terms and conditions upon which a marketing director agrees to operate on behalf of LBL. (Stat.Lims.Ex. 1, at 2.) The agreement describes in detail a marketing director's scope of authority, duties, and responsibilities; compensation, including bonuses; expenses, "chargebacks," and indebtedness for which the marketing director will be held accountable; territory; termination; and provisions dealing with assignment of the agreement, effective date, and contract construction. (*Id.* at 2–4.) In short, all conceivable aspects of the work relationship between an insurance company and its appointed personnel were included in the 1982 Marketing Director Agreement. Because it does not appear that any obviously important provisions were omitted from the agreement, the agreement is complete on its face.

Second, the evidence sought to be excluded as parol evidence—an oral agreement between LBL and Edwards prohibiting LBL from competing in recruiting agents in Edwards' market area and requiring LBL to assign to Edwards all LBL agents in that area—does not change or contradict the terms in the written agreement; it only adds to them. Instead of being entitled only to compensation and bonuses, as explicitly laid out in the agreement, the oral agreement would also make Edwards entitled to additional agents in his hierarchy based on where those agents were located.

Third, the evidence establishes that many of the marketing directors who signed the 1982 agreement intended the written agreement to constitute the entire agreement between the parties. (Tr.

ions, we have often intertwined the Restatement rule with our integration analysis.").

476:2–21, 478:7–13, 482:14–15, Test. of Charles F. Langner; Tr. 1007:19–1008:6, 1009:19–1010:2, Test. of Anthony J. Czerwinski; Ex. 60, Depo. of David Pyles 11:1–21 & Depo. of Marvin Nelson 12:11–13:3.[9])

Because all three tests for determining whether a writing is integrated weigh in favor of complete integration, I conclude that the 1982 Marketing Director Agreement is completely integrated, leading to the next inquiry under *Rowe v. Allely* — whether the oral agreement regarding assignment of agents is inconsistent with the integrated written agreement.

### b. Is Oral Agreement Regarding Assignment of Agents Consistent with 1982 Marketing Director Agreement?

■ As stated above, the oral agreement between Edwards and LBL regarding assignments of agents is not inconsistent with the integrated 1982 Marketing Director Agreement. In order for the oral agreement to stand as a separate enforceable contract, and not be superseded or invalidated by the integrated written agreement, the oral agreement must (1) be made for separate consideration or (2) be an agreement that might naturally be made as a separate agreement by similarly situated parties. *Rowe*, 244 Neb. at 487, 507 N.W.2d at 296.

### c. Separate Consideration

■ Consideration is an essential element of a contract, and consideration for purposes of a contract consists of a benefit to one party and a detriment to the other. *Ehlers v. Perry*, 242 Neb. 208, 217, 494 N.W.2d 325, 332 (1993); *Middagh v. Stanal Sound Ltd.*, 222 Neb. 54, 59, 382 N.W.2d 303, 307 (1986); *Commuter Developments & Investments, Inc. v. Gramlich*, 203 Neb. 569, 571, 279 N.W.2d 394, 395 (1979); *Restatement (Second) of Contracts* § 17, at 51 (1981) (except for certain contracts not at issue here, "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration"); *Restatement (Second) of Contracts* § 71, at 172 (1981) ("To constitute consideration, a performance or a return promise must be bargained for." A performance may be "an act other than a promise, or ... a forbearance, or ... the creation, modification, or destruction of a legal relation.").

■ There is no evidence in this case that LBL's oral agreement to assign certain agents to Edwards and to refrain from competing to recruit agents in Edwards' market area was supported by its own consideration, separate from the consideration supporting the written 1982 Marketing Director Agreement.[10] In short, there is no evidence that a performance or return promise was bargained for in exchange for LBL's oral promise regarding agent assignment and recruitment, making LBL's promise gratuitous and not supported by consideration. Alternatively, to the extent LBL and Edwards did bargain for a performance or return promise in making the oral agreement, there is no evidence that such con-

---

9. Edwards' counsel's objection to the form of the question that elicited the cited testimony is overruled. LBL's counsel asked the witnesses whether they thought the 1982 Marketing Director Agreement was complete and contained all terms, conditions, and promises made by LBL to them. The witnesses' answers to that question did not call for a legal conclusion regarding whether the contract itself was integrated for purposes of the parol evidence rule, as maintained by Edwards' counsel.

10. Indeed, the parties' Final Order on Pretrial Conference lists as a controverted issue "whether or not [the oral] agreement became part of the consideration for [the] *Marketing Director Agreement* and became an enforceable agreement between LBL and Edwards." (Filing 171, at 9–10 (emphasis added).) As the above analysis indicates, the relevant question (among others) for determining whether the oral agreement is itself enforceable is whether the oral agreement is supported by its own consideration *separate* from that in the Marketing Director Agreement. Thus, I shall not further address the issue of whether the oral agreement was part of the consideration for the 1982 Marketing Director Agreement.

sideration was not the same consideration that supported the written 1982 agreement—that is, Edwards' promise to manage, train, motivate, and retain agents for LBL in exchange for monetary benefits. Thus, I cannot conclude that the oral agreement regarding assignment and recruitment of agents in Edwards' market area was made for separate consideration than that contained in the subsequent Marketing Director Agreement.

#### d. Naturally Separate Agreement

An oral agreement regarding assignment of agents and competition by LBL in the recruitment of agents in a marketing director's geographical area is not one that similarly situated parties would naturally make separately from a written agreement that covered every conceivable facet of the work relationship between LBL and its marketing directors, as the 1982 Marketing Director Agreement did. One would not expect the parties to omit from that written agreement a term of appointment that would be a financial benefit to the marketing directors, as well as an additional responsibility.

### 2. Conclusion Regarding Oral Agreement as Separate Enforceable Agreement

 I conclude that parol evidence of LBL's oral promise regarding recruitment and assignment of agents in Edwards' market area is legally ineffective[11] to supply terms to the written 1982 Marketing Director Agreement and such oral agreement is superseded or invalidated by the Marketing Director Agreement because (1) the 1982 Marketing Director Agreement was fully integrated, (2) the oral agreement was not inconsistent with that integrated agreement, (3) the oral agreement was not made for separate consideration, and (4) the oral agreement is not one that would naturally have been made as a separate agreement by similarly situated parties. *Rowe*, 244 Neb. at 487, 507 N.W.2d at 296. If the parties had agreed that assignment of agents in one's marketing area was a benefit, term, or condition of a marketing director's appointment to LBL, such a term would have been stated in the 1982 Marketing Director Agreement. *Silverman & Silverman v. Arbor Street Partnership*, 213 Neb. 628, 632, 330 N.W.2d 904, 907 (1983) ("The inference is that if the parties had agreed upon a time for completion of the entire building, it would have been stated in the lease, just as the completion date for construction of the leased area was provided for ...."); lease fully integrated and parol evidence not admissible to supply terms omitted from the instrument).

11. "The parol evidence rule is not merely one of evidence, but is a rule of substantive law, which declares that certain kinds of facts are legally ineffective, and forbids such facts to be proved at all." *Arman v. Structiform Eng'g Co.*, 147 Neb. 658, 663, 24 N.W.2d 723, 726 (1946) (internal quotation marks and citation omitted). During the bench trial of this matter, LBL asserted a continuing parol evidence objection to various portions of the testimony. I took the objection under advisement and stated that I would rule on the objection in these Findings of Fact and Conclusions of Law. (Tr. 4:2–4.) As stated in *Traudt v. Nebraska Pub. Power Dist.*, 197 Neb. 765, 773, 251 N.W.2d 148, 152–53 (1977), regarding the above-discussed third integration inquiry (i.e., did the parties intend the writing to cover the whole transaction, as evidenced by their conduct and language):

"What [the written contract] was intended to cover cannot be known till we know what there was to cover. The question being whether certain subjects of negotiation were intended to be covered, we must compare the writing and the negotiations before we can determine whether they were in fact covered. *Thus the apparent paradox is committed of receiving proof of certain negotiations in order to determine whether to exclude them....* But the paradox is apparent only. The explanation is that these alleged negotiations are received only provisionally. Although in form the witnesses may be allowed to recite the facts, yet in truth the facts will be afterwards treated as immaterial and legally void, if the rule is held applicable." *Id.* (quoting 9 Wigmore on Evidence § 2430(2), at 98 (3d ed.1940)) (emphasis added).

Therefore, I shall enter judgment in favor of LBL and against Edwards on Edwards' second counterclaim regarding assignment of agents.

## C. Count III—Indebtedness Agreement

 Edwards claims that the March 7, 1986, agreement (the "Indebtedness Agreement") acknowledging Edwards' indebtedness to LBL created by Edwards' subagents should be rescinded because the agreement was procured by LBL's fraud and because Edwards was induced to execute the agreement by duress. Specifically, Edwards seeks recission of the agreement because LBL, without Edwards' knowledge, unilaterally waived the contractual requirements it imposed in its annualized commission loan agreements as a condition to advancing money to the subagents who caused the debt for which Edwards was held responsible; LBL failed to present Edwards with any proof of the amount of principal and interest owed by Edwards; LBL promised Edwards that the terms of the 1986 Indebtedness Agreement would allow the indebtedness to be "paid off without costing [Edwards] anything" (Tr. 221:11–15; 223:9–25; 234:7–17); and Edwards was threatened with termination if he failed to sign the agreement as it was presented to him.

LBL claims Edwards is precluded from contesting the indebtedness set forth in the 1986 agreement because it constitutes an account stated and by the doctrines of accord and satisfaction, waiver, estoppel, and the applicable statute of limitations. Edwards claims LBL is estopped from enforcing the 1986 agreement because of LBL's breach of the Marketing Director Agreement.[12]

### 1. Edwards' Claims

 As stated above, Edwards seeks recission of the 1986 Indebtedness Agreement due to fraud and duress, both of which are proper grounds for recission of a

contract. *Eliker v. Chief Indus., Inc.*, 243 Neb. 275, 278, 498 N.W.2d 564, 566 (1993).

### a. Fraud

 "A party who has been induced to enter a contract by fraud has, upon its discovery, an election of remedies, and he may either affirm the contract and sue for damages or disaffirm it and be reinstated to the position he was in before it was consummated." *Gitschel v. Sauer*, 212 Neb. 454, 456, 323 N.W.2d 93, 95 (1982). Edwards clearly seeks to rescind the contract, thereby placing the parties "in a status quo, that is, return the parties to their position which existed before the rescinded contract." *Kracl v. Loseke*, 236 Neb. 290, 303, 461 N.W.2d 67, 75 (1990). (Filing 171, Joint Order on Pretrial Conf., at 10–11.)

 A counterclaim that does not seek damages, but rather, a ruling that a contract was void and never existed because of fraud and duress, is an equitable counterclaim. As such, Edwards must prove fraud by clear and convincing evidence. *Stoural v. Blue Cross & Blue Shield*, 1 Neb.App. 669, 675, 510 N.W.2d 357, 360 (1993) (Wright & Miller–Lerman, JJ., concurring, but all judges agreeing that a defendant bringing an equitable counterclaim has burden of proof by clear and convincing evidence). " '[C]lear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved.' " *In re Estate of Stephenson*, 243 Neb. 890, 900, 503 N.W.2d 540, 548 (1993) (fraudulent concealment case).

While direct evidence is not always essential to this proof, inferences and presumptions of fraud drawn from circumstantial evidence must not be guess work or conjecture but must be rational and logical deductions from the facts

12. Because I have found that LBL did not breach Edwards' Marketing Director Agreement, I shall not address Edwards' claim that

LBL is estopped from enforcing the 1986 agreement because of LBL's breach of the Marketing Director Agreement.

and circumstances from which they are inferred. What constitutes fraud is a question of fact in each case.

Circumstantial evidence alone is not sufficient to sustain a finding of fraud unless the circumstances are of such a nature and so related to each other that the conclusion reached is the only one that can fairly and reasonably be drawn therefrom.

*ServiceMaster Indus. Inc. v. J.R.L. Enterprises, Inc.*, 223 Neb. 39, 43–44, 388 N.W.2d 83, 86 (1986) (internal citations and quotation marks omitted).

■ Nebraska recognizes causes of action for both fraudulent representation and fraudulent concealment in the contract context. *See ServiceMaster*, 223 Neb. at 43, 388 N.W.2d at 86 (fraudulent representation); *Gitschel*, 212 Neb. at 461, 323 N.W.2d at 97 (fraudulent representation); *In re Estate of Stephenson*, 243 Neb. at 899, 503 N.W.2d at 547 (fraudulent concealment); *Kracl v. Loseke*, 236 Neb. 290, 296, 461 N.W.2d 67, 72 (1990) (fraudulent concealment). In this case, Edwards essentially alleges that LBL withheld essential information about the debt with which Edwards was held accountable, and by withholding such information, fraudulently induced Edwards to sign the 1986 Indebtedness Agreement.

■ "[W]here one has a duty to speak, but deliberately remains silent, his silence is equivalent to a false representation" because the concealment is, in effect, a representation that the information disclosed is the whole truth. "The gist of the action is fraudulently producing a false impression upon the mind of the other party." *State ex rel. NSBA v. Douglas*, 227 Neb. 1, 25, 416 N.W.2d 515, 530 (1987), *cert. denied*, 488 U.S. 802, 109 S.Ct. 31, 102 L.Ed.2d 10 (1988); *In re Estate of Stephenson*, 243 Neb. at 898, 503 N.W.2d at 547; *Kracl*, 236 Neb. at 297, 461 N.W.2d at 72 (internal quotation marks and citations omitted). Nondisclosure constitutes "concealment" when a party has a duty to disclose information. *State ex rel. NSBA*, 227 Neb. at 25, 416 N.W.2d at 530.

■ To prove fraudulent concealment, Edwards must show that:

(1) the defendant had a duty to disclose a material fact; (2) the defendant, with knowledge of the material fact, concealed the fact; (3) the material fact was not within the plaintiff's reasonably diligent attention, observation, and judgment; (4) the defendant concealed the fact with the intention that the plaintiff act in response to the concealment or suppression; (5) the plaintiff, reasonably relying on the fact or facts as the plaintiff believed them to be as the result of the concealment, acted or withheld action; and (6) the plaintiff was damaged by the plaintiff's action or inaction in response to the concealment.

*In re Estate of Stephenson*, 243 Neb. at 899, 503 N.W.2d at 547. *See also Kracl*, 236 Neb. at 296, 461 N.W.2d at 72.

### i. *LBL's Duty to Disclose Material Facts*

■ "Although the general rule is that one party to a transaction has no duty to disclose material facts to the other, [an] exception to this rule is made when the parties are in a fiduciary relationship with each other. When a relationship of trust and confidence exists, the fiduciary has the duty to disclose to the beneficiary of that trust all material facts, and failure to do so constitutes fraud." *State ex rel. NSBA*, 227 Neb. at 23, 416 N.W.2d at 529 (internal quotation marks and citations omitted). In *Lincoln Benefit Life Co. v. Edwards*, 966 F.Supp. 911, 921 (1997), I concluded that there was an agency relationship between LBL and Edwards. "An agent and the principal are in a fiduciary relationship." *Grone v. Lincoln Mutual Life Ins. Co.*, 230 Neb. 144, 149, 430 N.W.2d 507, 511 (1988). *See also Andrews v. Schram*, 252 Neb. 298, 303, 562 N.W.2d 50, 54 (1997).

■ Thus, LBL had a duty to disclose to Edwards any material facts regarding the indebtedness for which Edwards was being held accountable under the 1986 Indebtedness Agreement. For purposes of fraud in the contract setting, "[a] misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." *Restatement (Second) of Contracts* § 162(2) (1981). *See also* E. Allan Farnsworth, *Farnsworth on Contracts* § 4.12, at 458 (2d ed.1998) (materiality requirement is met by showing misrepresentation would have been likely to induce a reasonable recipient to enter into the contract). Because a nondisclosure is a misrepresentation that the information disclosed is the whole truth, LBL's nondisclosures were material if Edwards' indebtedness situation, as portrayed by LBL to Edwards, was likely to induce a reasonable person to enter into the 1986 Indebtedness Agreement.

### ii. Fraudulent Concealment Analysis

Prior to 1983, LBL unilaterally—and without Edwards' knowledge—waived the contractual requirements it imposed in its annualized commission loan agreements as a condition to advancing money to the Clark agency subagents who caused the majority of the debt for which Edwards was held responsible. Specifically, LBL extended loans to the Clark agents without requiring complete applications, medical examinations approved by LBL's underwriting department, and submission of the initial premium, as required by the Submitted Annualized Commission/Loan Agreements of those agents.

LBL then announced to Edwards in May 1983 that, under his Marketing Director Agreement, he owed a debt to the company incurred by these same subagents totaling approximately $107,000. LBL took no further action as far as Edwards was concerned until March 7, 1986, when LBL presented Edwards with the Indebtedness Agreement at issue, which listed his indebtedness at $433,100.72 and included a seven-page handwritten attachment that purported to represent the debts created by several of Edwards' subagents for which Edwards was responsible. The amount of indebtedness owed by Edwards was never reflected on Edwards' commission statements, and could have been calculated and tracked only by consulting the statements of the individual agents who created the debt. A document reflecting the amounts of principal and interest owed by these subagents, or by Edwards, was never provided to Edwards, nor does such a document exist today.

In inducing Edwards to sign the agreement, LBL told Edwards he could retire his indebtedness without cost to him because of the provisions for increased commissions and agent assignment LBL had included in the contract. LBL also threatened to terminate Edwards' appointment with the company if he did not sign the agreement as it was presented to him.

Insofar as Edwards agreed to assume the indebtedness of the agents beneath him pursuant to his Marketing Director Agreement, Edwards in effect functioned as an insurer to LBL against mistakes made by those agents, as well as a guarantor of the insurance applicants' performance and fitness. Edwards agreed to this arrangement with the understanding that certain requirements would be met by LBL, like seeing that the provisions contained in the Submitted Annualized Commission/Loan Agreements of those agents were enforced when the agents requested loans against expected premium to be paid by those insurance applicants. However, in the Clark agency situation, by not enforcing the loan requirements, LBL effectively made Edwards an unlimited guarantor for the Clark agency—an arrangement which, without Edwards' knowledge or consent, substantially increased the original risk Edwards agreed to undertake, while significantly benefitting LBL.

Further, LBL's promise to Edwards—that under the terms of the Indebtedness Agreement it would cost him nothing to repay his debt—compounded LBL's concealment because this promise gave Edwards no cause to further investigate the validity of the debt. Even if Edwards had further investigated, he would have been unable to verify the truth of LBL's promise due to LBL's poor or non-existent record-keeping regarding major aspects of Edwards' debt, such as what portion of Edwards' debt was principal and what portion was interest, when the assessment of interest began, or the amounts to which interest was initially applied.

The evidence establishes that LBL failed to disclose crucial information to Edwards regarding his indebtedness situation, thereby creating an incomplete picture of the "whole truth" that would have been likely to induce a reasonable person to enter into the 1986 Indebtedness Agreement. LBL had sole knowledge of the facts that it had waived its own loan requirements for the Clark agents, charged Edwards with the debt caused in part by waiver of those requirements, and then concealed such facts from Edwards until this lawsuit was filed. Because Clark's insurance applications went directly to LBL without review by Edwards and because Clark's agents requested advances directly from the LBL home office pursuant to common practice in the company, neither Clark's fraudulent practices nor LBL's waiver of its loan requirements were within Edwards' reasonably diligent attention, observation, or judgment.[13]

The only rational and logical deduction that can be made from the above-described facts and circumstances is that LBL concealed its waiver of loan requirements from Edwards with the intent that Edwards sign what appeared to him to be an accurately stated Indebtedness Agreement which reflected a debt validly assigned to him pursuant to his agreements with the company. Edwards, reasonably relying on what LBL presented to him as the "whole truth," signed the agreement and, as a result, paid $255,550.29 toward the indebtedness, with LBL now requesting $1,066,596.88 more.

Thus, I find that Edwards has proved by clear and convincing evidence that LBL induced Edwards to enter the 1986 Indebtedness Agreement by fraudulent concealment—that is, LBL engaged in a continuous course of conduct wherein (1) LBL, without informing Edwards, waived its own loan requirements for the Clark agents, resulting in a substantial debt to Edwards because of the falsely inflated premium amounts against which LBL loaned money to Clark's agents in the name of fictitious companies; (2) LBL assured Edwards that signing the 1986 Indebtedness Agreement would cost him nothing, thereby inducing Edwards not to investigate the validity of the debt; and (3) LBL, having sole possession of the relevant information, presented Edwards with an attachment supposedly reflecting the debt amassed by several of Edwards' sub-agents without indicating the proportion of principal or interest owed by those sub-agents or owed by Edwards himself as his indebtedness ballooned from 1983 to 1986

---

**13.** LBL has asserted that Edwards must have been aware of Clark's agents getting advances on expected premium, despite LBL's waiver of the requirements set forth in the agents' Submitted Annualized Commission/Loan Agreements, because Edwards personally visited Clark's office approximately three times per week. Although an agent from Clark's agency, William J. Fanning, testified that Edwards must have known about the waiver of such requirements because Edwards told Fanning how to call LBL's home office to get loans for "out-of-the-ordinary advance[s]" in "special circumstance[s]," I cannot conclude from this testimony that Edwards must have known that LBL waived its loan requirements for the Clark agency "[i]n many instances," as LBL has admitted. (Tr. 231:12–13; 657:12–22; 659:1–6.) Further, as I advised counsel during trial, I do not imply from Mr. Fanning's testimony that Edwards knew that Clark was falsifying insurance applications and attempting to get loans on inflated premium amounts. (Tr. 665:20–667:11.)

and continued to do so thereafter. Therefore, Edwards is entitled to recission of the 1986 Indebtedness Agreement and its Addendum dated May 1, 1987, due to LBL's fraudulent concealment.

#### b. Duress

To constitute duress, there must be an application of such pressure or constraint that compels a person to go against that person's will and takes away that person's free agency, destroying the power of refusing to comply with the unjust demands of another.... Moreover, to be voidable because of duress, an agreement must not only be obtained by means of the pressure brought to bear, but the agreement itself must be unjust, unconscionable, or illegal. The essence of duress is the surrender to unlawful or unconscionable demands. It cannot be predicated upon demands which are lawful, or the threat to do that which the demanding party has a legal right to do.

*Bock v. Bank of Bellevue,* 230 Neb. 908, 914–15, 434 N.W.2d 310, 315 (1989). *See also Haumont v. Security State Bank,* 220 Neb. 809, 815, 374 N.W.2d 2, 7 (1985); *Carpenter Paper Co. v. Kearney Hub Publishing Co.,* 163 Neb. 145, 151–52, 78 N.W.2d 80, 84 (1956).

In this case, LBL threatened to terminate Edwards' appointment as a LBL marketing director and agent if Edwards refused to sign the 1986 Indebtedness Agreement as it was presented to him by LBL officials who, as found above, had fraudulently concealed material facts about the indebtedness situation that was represented in that agreement. Thus, LBL used its principal-agent relationship with Edwards to force Edwards to repay a debt he did not owe due to LBL's fraud. LBL's threat of termination for Edwards' failure to sign a document that had no relationship to his job performance, and that was invalid due to LBL's fraudulent concealment, constitutes an unconscionable and unlawful demand that destroyed Edwards' power to refuse to sign the 1986 Indebtedness Agreement. *See McCubbin v. Buss,* 180 Neb. 624, 144 N.W.2d 175 (1966) (duress found when employer threatened to terminate plaintiff's employment if plaintiff did not agree to discharge stock-purchase contract; court considered relationship between parties, impropriety of motive for threat, wrongful pressure exerted by the threat, causation between threat and the agreement, and inadequacy of consideration); E. Allan Farnsworth, *Farnsworth on Contracts* § 4.17, at 484 (2d ed. 1998) ("Duress may be found if, for example, an employer who has the right to terminate the employment at will threatens to fire an employee as a means of obtaining some unrelated advantage, such as the release of a claim or the sale of shares of stock."); *Restatement (Second) of Contracts* § 176 cmt. e, illus. 11 (1981). Therefore, Edwards is entitled to recission of the 1986 Indebtedness Agreement and its Addendum dated May 1, 1987, due to duress.

#### 2. LBL's Defenses

LBL claims Edwards is precluded from contesting the indebtedness set forth in the 1986 Indebtedness Agreement by the doctrines of accord and satisfaction, waiver, estoppel, and the applicable statute of limitations and because the agreement constitutes an account stated. (Filing 171, Joint Order on Pretrial Conf., at 11; LBL's Post–Trial Br., at 27.)

Because I do not have the benefit of any discussion in LBL's Proposed Findings of Fact and Conclusions of Law or Post–Trial Brief on the issues of accord and satisfaction, waiver, estoppel, and the applicable statute of limitations, I am left to guess at LBL's specific arguments with regard to such defenses. Suffice it to say that one who commits fraud by concealing material facts, thereby inducing another to enter a contract, may not benefit from such deceit or concealment by asserting defenses to recission of that contract. *See, e.g., Schendt v. Dewey,* 246 Neb. 573, 582,

520 N.W.2d 541, 548 (1994) (one who conceals material facts by deception, thereby preventing discovery of the wrong, cannot take advantage of such deceit or concealment by asserting statute of limitations or repose as a defense).

Similarly, LBL's argument that the 1986 Indebtedness Agreement constituted an "account stated" because "Edwards acknowledged owing the money, plus interest, when he executed the 1986 Agreement" (LBL's Post–Trial Brief, at 27) is nonsensical in light of my above finding that Edwards was induced to enter the contract while laboring under incomplete information regarding how the debt was incurred (i.e., LBL's waiver of its own loan requirements to agents who then caused the indebtedness for which Edwards was held responsible) and the amount of the debt (i.e., how much of the debt was principal and interest; when and to what amount interest was initially applied).

■■■■ "In creating an account stated, *the minds of the parties thereto must meet* and understand that a final adjustment of the respective demands of each upon the other is being made." *Hansen v. Abbott,* 187 Neb. 248, 250–51, 188 N.W.2d 717, 719 (1971) (noting that defendant "was fully aware of all the attendant circumstances and of what he was doing when he gave his check in full payment of the account. There was no mistake, *fraud,* or similar element involved.") (emphasis added). *See also Martin Milling Co. v. Evelyn,* 179 Neb. 31, 33, 136 N.W.2d 177, 178 (1965). Because LBL and Edwards did not enter the 1986 Indebtedness Agreement with knowledge of the same material facts, their minds could not meet in order to create an account stated.

Therefore, I find that none of the defenses asserted by LBL to Edwards' counterclaim on the 1986 Indebtedness Agreement preclude recission of the agreement and its addendum.

### 3. Damages

■■■■ Because the remedy of recission is aimed at returning the parties to a contract to the status quo, it involves not only cancellation of the contract, but also "a judicial effort to place the contractual parties in, as nearly as possible, substantially the same condition which existed when the contract was entered." *Kracl,* 236 Neb. at 303–04, 461 N.W.2d at 76. The parties have stipulated that from March 1, 1986, to March 31, 1998, Edwards has contributed $255,713.77 in payments and credits toward the indebtedness reflected in the 1986 agreement—an agreement which I shall order rescinded due to LBL's fraud and use of duress in inducing Edwards to enter the agreement. (Exs. 1039 & 1040; Tr. 992:4–22.)

To return Edwards to the status quo, I shall enter judgment in favor of Edwards and against LBL in the amount of $255,-713.77. As part of the equitable remedy of recission, I shall also award Edwards prejudgment interest at a rate of twelve percent per annum pursuant to Neb.Rev.Stat. § 45–104 (Michie 1995), which allows interest at that rate "on money due on any instrument in writing, or on settlement of the account from the day the balance shall be agreed upon, on money received to the use of another and retained without the owner's consent, express or implied, from the receipt thereof, and on money loaned or due and withheld by unreasonable delay of payment." *See Society Nat'l Bank v. Parsow Partnership, Ltd.,* 122 F.3d 574 (8th Cir.1997) (upholding prejudgment interest award of six percent per annum pursuant to Neb.Rev.Stat. § 45–102 in case where court rescinded securities transaction on basis of mutual mistake).[14]

---

**14.** The court in *Society Nat'l Bank,* 122 F.3d at 577, noted that Neb.Rev.Stat. § 45–102 provides a six percent interest rate for interest upon "the loan or forbearance of money," while Neb.Rev.Stat. § 45–104 (Michie 1995) allows interest at twelve percent per annum, as stated in the text above. While the Eighth Circuit Court of Appeals was not convinced that either of these statutes was particularly applicable to the *Society Nat'l Bank* case, the

Because Edwards paid a total of $255,-713.77 in monthly installments from March 1986 to March 1998 (exs. 1039 & 1040), I shall award interest at twelve percent per annum as of the date of each installment payment to the date of judgment, as laid out in the forthcoming order and judgment.

To the extent LBL may argue that it should be reimbursed for increased commissions it paid Edwards under the 1986 Indebtedness Agreement, I decline to award LBL any sort of reimbursement for money it paid Edwards pursuant to terms in the agreement that were aimed at "assist[ing] Edwards to fulfill his obligation to LBL for the indebtedness." (Ex. 38, 1986 Indebtedness Agreement.) Inducing Edwards to sign the 1986 Indebtedness Agreement by including provisions for increased commissions and additional agent assignments was simply another facet of the fraud LBL perpetrated upon Edwards to provoke him to sign the agreement in the first place. LBL cannot now claim an offset for what was, in effect, the "bait" LBL dangled to fraudulently induce Edwards to sign the agreement. Put simply, LBL cannot recoup the costs of its fraudulent scheme.

### D. Count IV—Continuing Compensation Addendum (Breach of Contract)

Edwards claims he is entitled to damages caused by LBL's failure to perform any of its obligations under the July 10, 1985, Continuing Compensation Addendum. (Filing 171, Joint Order on Pretrial Conference, at 12 (two issues in Count IV are occurrence of breach of Continuing Compensation Addendum and amount of damages).) The parties have stipulated that the Continuing Compensation Addendum is "a valid and enforceable contract between LBL and Edwards." Because LBL concedes that it has breached the Continuing Compensation Addendum by stipulating that "LBL owes Edwards monies under that contract" (Filing 171, Joint Order on Pretrial Conference, Stipulation Regarding Continuing Compensation Addendum), the only remaining issue is the amount of damages due Edwards for this breach.

Edwards and LBL each presented expert testimony regarding the amount due Edwards under the Continuing Compensation Addendum dated July 10, 1985.[15] After consideration of the language of the Addendum itself, as well as the thorough and well-explained reports of each of these experts, I conclude that the damages owed Edwards under the 1985 Continuing Compensation Addendum may be calculated using the following analysis:

1. The parties concede that the Continuing Compensation Addendum is a valid, enforceable contract that applies to Edwards' separation from LBL in March 1995. (*See* Filing 171, Joint Order on Pretrial Conference, Stipulation

court found that section 45–102 "more closely fit[ ]" the fact scenario in that case—that is, recission of a securities transaction due to mutual mistake when a subscription and distribution agent mistakenly issued 28,750 shares and warrants to an investor, who paid the subscription price of $230,000 for the securities. The court rescinded the transaction, ordering the investor to return the securities and the agent to refund the purchase price.

Recission of the contract in this case is not due to Edwards' and LBL's mutual mistake, as in *Society Nat'l Bank*, but LBL's fraud. Due to the fraudulent method by which LBL procured Edwards' money, LBL collected and retained Edwards' money unreasonably. Therefore, I shall award interest at the twelve percent rate specified in Neb.Rev.Stat. § 45–104.

**15.** The only damages evidence presented was evidence regarding what LBL owes Edwards under the terms of the Continuing Compensation Addendum itself. Edwards' expert, Steven E. Dyer, has a bachelor's degree in economics, an M.B.A., and a law degree. Dyer is also a certified public accountant and licensed attorney. LBL's expert, Debbie L. Grenemeier, has a bachelor's degree in finance and has been employed at LBL for 10 years. (Tr. 493:11–494:13; 1084:3–16.)

Regarding Continuing Compensation Addendum.)

2. The parties agree that money is due Edwards under the agreement; therefore, the parties also agree that Edwards has satisfied the $500,000 average and 75 percent persistency prerequisites in paragraphs (a) and (b) of the Continuing Compensation Addendum.[16] (Ex. 47.)

3. The parties agree on the general agencies and the plans of insurance assigned to Edwards on his date of termination. (*Compare* Ex. 52, Report on Measure of Damages by Steven E. Dyer, Ex. 35 *with* Ex. 1052, Report of Calculations by Debbie Grenemeier, Schedules D-1 to D-9.) Further, it is apparent that Edwards was receiving "level 20" commissions at the time of his termination. (*See,* Tr. 1233:16-1234:25; Ex. 65, only contract shown as effective at time of Edwards' termination in March 1995 was level 20.) LBL codes "general agencies," as referred to in the Continuing Compensation Addendum, as "level 9" for commission purposes. (Tr. 1235:14-23.) In figuring the amount

due under the Addendum, Grenemeier awarded Edwards the difference between level 20 and level 9 on general agency activity in his hierarchy, while Dyer inflated that amount "in order to provide Edwards with compensation for Level 7 and 8 agency." (Ex. 52, Schedule D.)

4. Paragraph (c) of the Continuing Compensation Addendum states in relevant part: "The commissions paid shall be an overwriting first year commission at a rate equal to the net first year commissions being paid to the Marketing Director for such general agencies and on the plans of insurance on the termination date." (Ex. 47.) Thus, beginning at the date of his termination from LBL, Edwards is entitled to overwrites at a commission level 20 for the general agencies in his hierarchy, reflected in Debbie Grenemeier's report at Schedules D-1 (1997), D-4 (1996), and D-7 (1995).

5. Therefore, LBL owes Edwards the following amounts under the Continuing Compensation Addendum:

| 1995: | $20,146.05 | (Ex. 1052, Schedule D-7) |
| 1996: | $12,555.30 | (Ex. 1052, Schedule D-4) |
| 1997: | $ 4,624.00 | (Ex. 1052, Schedule D-1) |
| | $37,325.35 | |

LBL also owes Edwards commissions for 1998 and into the future, calculated in the same manner used in Schedules D-1, D-4, and D-7 of Exhibit 1052. Future payments to Edwards under the Continuing Compensation Addendum are, of course, subject to the conditions that Edwards not compete with LBL "in the marketing of plans of insurance or is

guilty of conduct [that] is injurious" and that LBL may terminate payments if they total less than $600.00 annually. (Ex. 47.)

6. I do not adopt Steven Dyer's calculation of damages due under the Continuing Compensation Addendum for the following reasons:

16. As stated in the above Findings of Fact, paragraphs (a) and (b) of the Addendum provided as follows:
 a. The Company [LBL] will determine the average first year premium produced by each general agency assigned to the Marketing Director for the 3 years prior to the termination date.
 b. If the sum of the averages is at least $500,000.00 and the 13 month persistency of such business is at least 75%, the Company will pay to the Marketing Director an overwriting commission on first year premium produced by each such general agency after the termination date on an amount of first year premium not exceeding the determined average for each such general agency.
(Ex. 47.)

(a) Grenemeier awarded Edwards the difference between level 20 and level 9 on general agency activity, while Dyer inflated that amount in order to provide Edwards with compensation for level 7 and 8 agency which he believes occurred. Such level 7 and 8 activity is not readily apparent to the court in the information provided to it.

(b) Dyer's calculations include compensation for non-assigned agents and level 30 commissions. Given the disposition of Counts I and II above and the plain words of the Addendum which refer to general agencies "assigned" to the Marketing Director, Edwards is not entitled to these amounts.

For the above reasons, I shall enter judgment in favor of Edwards on Count IV in the total amount of $37,325.35 for payments due under the Continuing Compensation Addendum dated July 10, 1985, for calendar years 1995, 1996, and 1997. LBL shall continue to pay Edwards amounts due under the Continuing Compensation Addendum for 1998 and into the future, to be calculated in the same manner as were Schedules D–1, D–4, and D–7 in Exhibit 1052.

### E. Count V—Continuing Compensation Addendum (Tort)

 Edwards brings a tort claim against LBL for its alleged breach of the implied covenant of good faith and fair dealing arising from LBL's failure to pay Edwards any benefits under the Continuing Compensation Addendum.[17] In this regard, Edwards claims that the Continuing Compensation Addendum was like a policy of insurance. Edwards seeks damages for economic loss, as well as mental and emotional distress.

Nebraska courts have recognized two types of bad-faith claims against an insurer:

The first is a traditional third-party bad faith claim which arises when an insurer wrongfully fails to settle a claim brought by a third party against an insured. See *Hadenfeldt v. State Farm Mut. Auto. Ins. Co.*, 195 Neb. 578, 239 N.W.2d 499 (1976). The second type is a first-party bad faith action based upon allegations that the insurer, in bad faith, refused to settle with its own policyholder insured, who thereby suffered some type of direct loss. *Braesch v. Union Ins. Co.*, 237 Neb. 44, 464 N.W.2d 769 (1991).

*Weatherly v. Blue Cross Blue Shield Ins. Co.*, 2 Neb.App. 669, 678, 513 N.W.2d 347, 353–54 (Neb.App.1994).

### 1. Third–Party Bad–Faith Actions Against Insurers

In *Hadenfeldt,* insured motorists sued their automobile liability insurer, alleging that the insurer failed to negotiate and settle a third-party's claims against the insured motorists within their insurance policy's coverage amount. Although finding no merit to the insureds' claim because the evidence showed the insurer had no opportunity to settle the claims within the policy limits, the court recognized the existence of a third-party bad-faith claim against an insurer.

"The liability of an insurer to pay in excess of the face of the policy accrues when the insurer, having exclusive control of settlement, in bad faith refuses to compromise a claim for an amount within the policy limit.... In the event the insurer elects to resist a claim of liability, or to effect a settlement thereof on such terms as it can get, there arises an implied agreement that it will exercise due care and good faith where the rights of an insured are concerned."

*Hadenfeldt,* 195 Neb. at 582–83, 239 N.W.2d at 502 (quoting *Olson v. Union*

---

**17.** Because the parties do not assert claims under the Employment Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 (1999), the court has not considered any issues that may arise under that act.

*Fire Ins. Co.*, 174 Neb. 375, 118 N.W.2d 318(1962)).

## 2. First–Party Bad–Faith Actions Against Insurers

In *Braesch*, insurance policyholders—a husband and wife whose daughter was killed by an uninsured motorist—filed a claim with their automobile insurance carrier under the provision in their insurance contract which stated that the insurance carrier would pay up to $100,000 for sums the insured was legally entitled to recover from an uninsured motorist for bodily injury. The insurance company refused to pay the claim, forcing the policyholders to litigate the matter, resulting in a judgment of $185,000. In a subsequent lawsuit against the insurance company, the policyholders brought a tort claim of bad faith against their insurance carrier for failure to settle the policyholders' claim.

Extending its recognition of third-party bad-faith claims against insurers to first parties, the *Braesch* court held that the policyholders could proceed on their bad-faith claim against the insurance company. The Nebraska Supreme Court specifically recognized the tort of an insurer's bad-faith refusal to settle a first-party insurance claim with a policyholder, noting that "[t]he theory underlying the tort is that the law implies a covenant of good faith and fair dealing" which arises from a contractual relationship between the policyholder and the insurer. *Braesch*, 237 Neb. at 51, 55, 464 N.W.2d at 774, 776. The court characterized as "unfounded" the concern that "the floodgates will be opened for tort actions based upon a breach of any contract" if the court recognized first-party bad-faith claims against insurers, finding that "[t]he public interest in insurance contracts, the nature of insurance contracts, and the inequity of the bargaining power between the insurer and the policyholder all serve to distinguish insurance contracts from other types of contracts." *Id.*

Regarding the public interest in insurance contracts, the court noted that the insurance industry is heavily regulated; a Nebraska statute declared that the business of apportioning loss and distributing benefits is public in character and must be "actuated by good faith"; and the Nebraska Legislature has required that all automobile liability policies include coverage for uninsured motorists, making the public interest of the "highest order" in the *Braesch* case. *Id.* at 52, 464 N.W.2d at 774 (citing Neb.Rev.Stat. §§ 44–101 (Reissue 1988) and Neb.Rev.Stat. § 60–509.01 (Reissue 1988)). The *Braesch* court also noted the "noncommercial" nature of insurance which distinguishes an insurance contract from other contracts "for which a breach does not sound in tort." *Id.* at 53, 464 N.W.2d at 775.

> "Tort actions for breach of covenants implied in certain types of contractual relationships are most often recognized where the type of contract involved is one in which the plaintiff seeks something more than commercial advantage or profit from the defendant. When dealing with an innkeeper, a common carrier, a lawyer, a doctor *or an insurer*, the client/customer seeks service, security, peace of mind, protection or some other intangible. These types of contracts create special, partly noncommercial relationships, and when the provider of the service fails to provide the very item which was the implicit objective of the making of the contract, then contract damages are seldom adequate, and the cases have generally permitted the plaintiff to maintain an action in tort as well as in contract."

*Id.* at 52, 464 N.W.2d at 774–75 (quoting *Rawlings v. Apodaca*, 151 Ariz. 149, 159, 726 P.2d 565, 575 (1986)) (emphasis in *Braesch* ). Finally, the court emphasized that the inequity in bargaining power between an insurer and an insured differentiates an insurance contract from the "run-of-the-mill contract." *Id.* at 53, 464 N.W.2d at 775.

### 3. Extending First- and Third–Party Bad–Faith Actions to Other Contracts

Edwards specifically asks this court to extend the "doctrine of tort liability for bad[-]faith breach of the covenant of go[o]d faith and fair dealing beyond insurance cases [because] the key characteristics that give rise to the tort are present," relying on various California cases to identify these key characteristics. (Edwards' Post–Trial Br. at 141–42.) While the Nebraska courts have held that an insurer's breach of the terms of an insurance policy can be a tort, as discussed above, the courts have been careful to emphasize that "[t]his is not to hold that the breach of any term of a contract may be sued as a tort, [or] that a plaintiff may state a cause of action by merely alleging a breach of a contract." *Weatherly,* 2 Neb.App. at 677–78, 513 N.W.2d at 353. As discussed above, the *Braesch* court took great care to distinguish an insurance contract from other commercial contracts, specifically confining its discussion to contracts between an insurer and insured.

The parties do not cite, nor have I found, any Nebraska case which has extended the tort of bad-faith breach of the covenant of good faith and fair dealing to a situation similar to the Continuing Compensation Addendum at issue in this case. Further, based on existing precedent, I find that the Nebraska Supreme Court would not make such an extension in its tort law if the court were faced with this issue. *See Lindsay Mfg. Co. v. Hartford Accident & Indem., Co.,* 118 F.3d 1263, 1267–68 (8th Cir.1997) (if state's highest court has not yet addressed an issue, federal court must "attempt to predict what that court would decide if it were to address the issue," considering " 'relevant state precedent, analogous decisions, considered dicta, . . . and any other reliable data.' ") *Id.* (quoting *Ventura v. Titan Sports, Inc.,* 65 F.3d 725, 729 (8th Cir. 1995), *cert. denied,* 516 U.S. 1174, 116 S.Ct. 1268, 134 L.Ed.2d 215 (1996)).

The Continuing Compensation Addendum (ex. 47) in this case was a contract between an insurance company and one of its marketing directors wherein the company agreed to continue paying the marketing director commissions produced in the marketing director's hierarchy in the event the marketing director's appointment to the company was terminated because of retirement, disability, or death. As consideration, the marketing director was required to continue to "recruit, train and supervise quality general agencies to market the Company's plans of insurance" during his term of appointment. (Ex. 47, at 1.) Application of the factors discussed in *Braesch* which distinguish contracts between an insured and insurer to which the tort of bad faith applies from other types of contracts convinces me that the Nebraska Supreme Court would not apply the *Braesch* rationale to the contract at issue here.

Public interest in an individual's compensation contract with an insurer who has appointed the individual as an agent—and as a marketing director in this case—is negligible compared to the public interest in the " 'business of apportioning and distributing losses' " caused by uninsured motorists to members of the public, as discussed in *Braesch,* 237 Neb. at 52, 464 N.W.2d at 774 (quoting Neb.Rev.Stat. § 44–101 (Reissue 1988)). Further, the inequity in bargaining power between an insurer and an insured, described in *Braesch,* is not analogous to the relative bargaining power between an insurance agent and his principal who are negotiating long-term compensation in exchange for quality job performance, as memorialized by the Continuing Compensation Addendum in this case.

Finally, while it could be argued that the Addendum should be distinguished from "other types of contracts for which a breach does not sound in tort" because the objective of the Addendum was to provide Edwards with "something more than commercial advantage or profit" from LBL—

such as security, peace of mind, and protection to Edwards in his retirement or during a disability—I do not believe the Nebraska Supreme Court would rely on the nature of the contract alone in light of the public-interest and bargaining-power factors discussed above which distinguish this case from *Braesch* and similar cases. *Id.* at 52, 464 N.W.2d at 774–75. Even if the Nebraska Supreme Court did rely heavily on the nature of the Addendum, I do not believe it would find a contract for long-term compensation in exchange for quality job performance analogous to the noncommercial intangibles sought by a patient from a doctor, a passenger from a common carrier, a client from a lawyer, or a policyholder from an insurer—examples given in *Braesch* to clarify the nature of the contract at issue there.

Because the Nebraska Supreme Court has not, and would not, extend applicability of the tort of bad-faith breach of the covenant of good faith and fair dealing to the long-term compensation contract between Edwards and LBL, I shall enter judgment in favor of LBL on Count V of Edwards' counterclaims.

### 4. Certification of Question to Nebraska Supreme Court

 A "controverted issue" in this case, according to the Joint Order on Pretrial Conference (filing 171), is whether I should certify the following question to the Nebraska Supreme Court: "Under Nebraska law, is there a cause of action in tort for the breach of the implied covenant of good faith and fair dealing in a commercial contract not involving a first-party or [ ] third-party insurance claim?" (Filing 171, at 14 ¶ 8.)

 Whether to use a state's certification procedure is within the " 'sound discretion of the federal court.' " *Perkins*

*v. Clark Equip. Co., Melrose Div.*, 823 F.2d 207, 209 (8th Cir.1987) (quoting *Lehman Brothers v. Schein*, 416 U.S. 386, 391, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974)). Further, " '[a]bsent a 'close' question and lack of state sources enabling a nonconjectural determination, a federal court should not avoid its responsibility to determine all issues before it.' " *Id.* (quoting *Shakopee Mdewakanton Sioux Community v. City of Prior Lake*, 771 F.2d 1153, 1157 n. 2 (8th Cir.1985), *cert. denied*, 475 U.S. 1011, 106 S.Ct. 1185, 89 L.Ed.2d 301 (1986)). *See also Hatfield v. Bishop Clarkson Memorial Hosp.*, 701 F.2d 1266 (8th Cir.1983) (discussing various factors which may affect certification decision, including closeness of the question; lack of state precedent; conflicting public policy aims; whether case involves federal question or is strict diversity; and likelihood of legal issue recurring).

I believe *Braesch, Hadenfeldt, Weatherly,* and other Nebraska cases [18] addressing bad-faith claims against insurers establish that the legal issue involved here cannot be characterized as a "close" one and provide sufficient guidance so that my decision regarding the tort of bad faith in this case is not conjecture. Therefore, I shall decline to certify the above question to the Nebraska Supreme Court.

### IV. CONCLUSION

**Count I:** Because Tony D. Weber and Leroy Liberda began receiving increased commission rates on various insurance products not when they were marketing directors, but when they entered into Brokerage Marketing Director contracts in 1985 to perform functions for LBL under terms that were substantially different than those applicable to marketing directors, I find that LBL did not breach the portion of Edwards' N1982 Marketing Di-

18. *Ruwe v. Farmers Mutual United Ins. Co., Inc.*, 238 Neb. 67, 469 N.W.2d 129 (1991) (bad-faith tort claim against insurer in first-party context); *Olson v. Union Fire Ins. Co.*, 174 Neb. 375, 118 N.W.2d 318 (1962) (tort of bad faith in third-party context); *Bailey v. Farmers Union Co-Operative Ins. Co.*, 1 Neb. App. 408, 498 N.W.2d 591 (Ct.App.1992) (bad-faith claim against insurer in first-party context).

rector Agreement that required commission amendments to all marketing directors' agreements if an amendment was made to one marketing director's rate of commission. Therefore, I shall enter judgment in favor of plaintiff Lincoln Benefit Life and against defendant Robert R. Edwards on Count I of Edwards' counterclaims regarding preferential commission rates.

*Count II:* Parol evidence of LBL's oral promise regarding recruitment and assignment of agents in Edwards' market area is legally ineffective to supply terms to the written 1982 Marketing Director Agreement and such oral agreement is superseded or invalidated by the Marketing Director Agreement because (1) the 1982 Marketing Director Agreement was fully integrated, (2) the oral agreement was not inconsistent with that integrated agreement, (3) the oral agreement was not made for separate consideration, and (4) the oral agreement is not one that would naturally have been made as a separate agreement by similarly situated parties. *Rowe,* 244 Neb. at 487, 507 N.W.2d at 296. Therefore, I shall enter judgment in favor of plaintiff Lincoln Benefit Life and against defendant Robert R. Edwards on Count II of Edwards' counterclaims regarding assignment of agents.

*Count III:* Edwards has proved by clear and convincing evidence that LBL induced Edwards to enter the 1986 Indebtedness Agreement by fraudulent concealment— that is, LBL engaged in a continuous course of conduct wherein (1) LBL, without informing Edwards, waived its own loan requirements for the Clark agents, resulting in a substantial debt to Edwards because of the falsely inflated premium amounts against which LBL loaned money to Clark's agents in the name of fictitious companies; (2) LBL assured Edwards that signing the 1986 Indebtedness Agreement would cost him nothing, thereby inducing Edwards not to investigate the validity of the debt; and (3) LBL, having sole possession of the relevant information, presented

Edwards with an attachment supposedly reflecting the debt amassed by several of Edwards' subagents without indicating the proportion of principal or interest owed by those subagents or owed by Edwards himself as his indebtedness ballooned from 1983 to 1986 and continued to do so thereafter. Therefore, Edwards is entitled to recission of the 1986 Indebtedness Agreement and its Addendum due to LBL's fraudulent concealment.

LBL's threat of termination for Edwards' failure to sign a document that had no relationship to his job performance, and that was invalid due to LBL's fraudulent concealment, constitutes an unconscionable and unlawful demand that destroyed Edwards' power to refuse to sign the 1986 Indebtedness Agreement. Therefore, Edwards is also entitled to recission of the 1986 Indebtedness Agreement and its Addendum due to duress.

Based on these conclusions, I shall enter judgment in favor of defendant Robert K. Edwards and against plaintiff Lincoln Benefit Life rescinding the 1986 Indebtedness Agreement and the Addendum thereto and awarding to Robert R. Edwards $255,-713.77, plus prejudgment and post-judgment interest, as provided below.

*Count IV:* Because the parties have stipulated that the Continuing Compensation Addendum dated July 10, 1985, is a valid and enforceable contract and that LBL owes Edwards money pursuant to the Addendum, I shall enter judgment in favor of Edwards on Count IV in the total amount of $37,325.35 for payments due under the Continuing Compensation Addendum for calendar years 1995, 1996, and 1997. I shall also order that LBL continue paying Edwards amounts due under the Continuing Compensation Addendum for 1998 and into the future, to be calculated in the same manner as were Schedules D-1, D-4, and D-7 in Exhibit 1052.

*Count V:* Because the Nebraska Supreme Court has not, and would not, extend applicability of the tort of bad-faith

breach of the covenant of good faith and fair dealing to the long-term compensation contract between Edwards and LBL, I shall enter judgment in favor of LBL on Count V of Edwards' counterclaims. Further, I shall decline to certify to the Nebraska Supreme Court the question whether a cause of action in tort exists under Nebraska law for the breach of the implied covenant of good faith and fair dealing in a commercial contract not involving a first-party or third-party insurance claim.

IT IS ORDERED:

1. Judgment shall be entered in favor of plaintiff Lincoln Benefit Life and against defendant Robert R. Edwards on **Count I** of Edwards' counterclaims regarding preferential commission rates.

2. Judgment shall be entered in favor of plaintiff Lincoln Benefit Life and against defendant Robert R. Edwards on **Count II** of Edwards' counterclaims regarding assignment of agents.

3. On **Count III** of defendant Robert R. Edwards' counterclaims, and on plaintiff Lincoln Benefit Life's claim that it is owed money under the Agreement Acknowledging Edwards' Indebtedness to Lincoln Benefit Life dated March 7, 1986 (the "1986 Indebtedness Agreement"), judgment shall be entered in favor of defendant Robert R. Edwards and against plaintiff Lincoln Benefit Life (1) rescinding the Agreement acknowledging Edwards' indebtedness to Lincoln Benefit Life dated March 7, 1986 (the "1986 Indebtedness Agreement") and the Addendum to Agreement dated May 1, 1987, and (2) awarding to Robert R. Edwards $255,713.77, plus (i) prejudgment interest at a rate of twelve percent per annum from the date of each of Edwards' installment payments toward his alleged indebtedness to the date of judgment, as listed below, and (ii) post-judgment interest as provided by law. Prejudgment interest is due on the following amounts from the date listed beside each amount to the date of judgment:

| Monthly Payment or Credit | Prejudgment Interest Due From This Date to Date of Judgment |
| --- | --- |
| $10,937.38 | 03/31/86 |
| 428.62 | 04/30/86 |
| 185.51 | 05/31/86 |
| 4,508.49 | 06/30/86 |
| 15,334.60 | 07/31/86 |
| 11,074.90 | 08/31/86 |
| 2,999.70 | 09/30/86 |
| 1,156.57 | 10/31/86 |
| 6,546.86 | 11/30/86 |
| 7,084.72 | 12/31/86 |
| 6,852.43 | 01/31/87 |
| 8,578.37 | 02/28/87 |
| 10,465.26 | 03/31/87 |
| 6,106.82 | 04/30/87 |
| 1,581.00 | 05/31/87 |
| 1,761.25 | 06/30/87 |
| 1,016.45 | 07/31/87 |
| 1,037.98 | 08/31/87 |
| 2,578.28 | 09/30/87 |
| 5,763.27 | 10/13/87 |
| 15,100.36 | 10/31/87 |
| 356.01 | 11/30/87 |
| 2,984.35 | 12/31/87 |
| 2,808.77 | 01/31/88 |
| 2,812.98 | 02/28/88 |
| 90.12 | 03/31/88 |
| 2,815.26 | 04/30/88 |

| Monthly Payment or Credit | Prejudgment Interest Due From This Date to Date of Judgment |
|---|---|
| 67.41 | 05/31/88 |
| 685.50 | 06/30/88 |
| 2,862.75 | 07/31/88 |
| 2,763.32 | 08/31/88 |
| 12.32 | 09/30/88 |
| 4.32 | 10/31/88 |
| 2,391.62 | 11/30/88 |
| 2,767.32 | 12/31/88 |
| 8,273.32 | 01/31/89 |
| 8.32 | 02/28/89 |
| 2,763.32 | 03/31/89 |
| 2,759.32 | 04/30/89 |
| 2,767.32 | 05/31/89 |
| 2,763.32 | 06/30/89 |
| 2,744.27 | 07/31/89 |
| 2,763.32 | 08/31/89 |
| 2,758.24 | 09/30/89 |
| 2,762.24 | 10/31/89 |
| 2,766.24 | 11/30/89 |
| 2,758.24 | 12/31/89 |
| 2,766.24 | 01/31/90 |
| 2,757.28 | 02/28/90 |
| 2,762.24 | 03/31/90 |
| 2,899.24 | 04/30/90 |
| 5,221.56 | 05/31/90 |
| 4,300.28 | 06/30/90 |
| 2,778.93 | 07/31/90 |
| 2,761.04 | 08/31/90 |
| 4,674.26 | 09/30/90 |
| 3,500.02 | 10/31/90 |
| 2,871.14 | 11/30/90 |
| 5,997.76 | 12/31/90 |
| 2,865.05 | 01/31/91 |
| 2,828.42 | 02/28/91 |
| 3,306.76 | 03/31/91 |
| 2,991.76 | 04/30/91 |
| 2,770.76 | 05/31/91 |
| 2,762.76 | 06/30/91 |
| 2,775.69 | 07/31/91 |
| 2,776.76 | 08/31/91 |
| 2,762.76 | 09/30/91 |
| 2,770.76 | 10/31/91 |
| 7.76 | 11/30/91 |
| 11.76 | 12/31/91 |
| 10.04 | 01/31/92 |
| 2.04 | 02/28/92 |
| 6.04 | 03/31/92 |
| 662.92 | 04/30/92 |
| 7.76 | 05/31/92 |
| 11.76 | 06/30/92 |
| 22.77 | 07/31/92 |
| 6.89 | 08/31/92 |
| 16.83 | 09/30/92 |
| 9.48 | 10/31/92 |
| 12.24 | 11/30/92 |
| 7.28 | 12/31/92 |
| 13.60 | 01/31/93 |
| 12.14 | 02/28/93 |
| 324.48 | 03/31/93 |
| 20.26 | 04/30/93 |

| Monthly Payment or Credit | Prejudgment Interest Due From This Date to Date of Judgment |
|---|---|
| 5.48 | 05/31/93 |
| 18.73 | 06/30/93 |
| 13.52 | 07/31/93 |
| 7.86 | 08/31/93 |
| 24.66 | 09/30/93 |
| 9.48 | 10/31/93 |
| 5.48 | 11/30/93 |
| 13.48 | 12/31/93 |
| 4.44 | 01/31/94 |
| 346.34 | 03/31/94 |
| 1.08 | 04/30/94 |
| 2.16 | 06/30/94 |
| 46.36 | 07/31/94 |
| 1.08 | 08/31/94 |
| 33.05 | 09/30/94 |
| 1.08 | 10/31/94 |
| 1.08 | 11/30/94 |
| 31.98 | 01/31/95 |
| 332.98 | 03/31/95 |
| 1.08 | 04/30/95 |
| 1.08 | 05/31/95 |
| 56.89 | 06/30/95 |
| 3.24 | 07/31/95 |
| 15.62 | 08/31/95 |
| 21.36 | 10/31/95 |
| 149.83 | 03/31/96 |
| 72.38 | 09/30/96 |
| 50.16 | 02/28/97 |
| 399.41 | 03/31/97 |
| 54.02 | 09/30/97 |
| 220.29 | 10/31/97 |
| 12.66 | 11/30/97 |
| 21.20 | 01/31/98 |
| 238.57 | 03/31/98[19] |

4. Judgment shall be entered in favor of defendant Robert R. Edwards and against plaintiff Lincoln Benefit Life on **Count IV** of Edwards' counterclaims regarding breach of the July 10, 1985, Continuing Compensation Addendum in the amount of $37,325.35, plus post-judgment interest as provided by law, for payments due under the Continuing Compensation Addendum for calendar years 1995, 1996, and 1997. Judgment is also entered in favor of defendant Robert R. Edwards and against plaintiff Lincoln Benefit Life on **Count IV,** requiring that Lincoln Benefit Life shall continue to pay Edwards

amounts due under the Continuing Compensation Addendum for 1998 and into the future, to be calculated in the same manner as were Schedules D–1, D–4, and D–7 in Exhibit 1052.

5. Judgment shall be entered in favor of plaintiff Lincoln Benefit Life on **Count V** of defendant Robert R. Edwards' counterclaims, and the parties' request that this court certify to the Nebraska Supreme Court the question whether a cause of action in tort exists under Nebraska law for the breach of the implied covenant of good faith and fair dealing in a commercial

19. Months in which no payment or credit was made toward Edwards' indebtedness were not included in the above entries. (*Compare* Exs. 1039 & 1040.)

contract not involving a first-party or third-party insurance claim is denied.

6. Costs are taxed to plaintiff Lincoln Benefit Life.

7. Judgment shall be entered by separate document.